In the

# United States Court of Appeals

### For the Seventh Circuit

No. 01-3565

IN RE HIGH FRUCTOSE CORN SYRUP ANTITRUST LITIGATION.

APPEAL OF A & W BOTTLING, INC., *et al.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 95 C 1477, MDL 1087—**Michael M. Mihm**, *Judge.*

ARGUED MAY 17, 2002—DECIDED JUNE 18, 2002

Before BAUER, POSNER, and KANNE, *Circuit Judges.*

POSNER, *Circuit Judge.* The plaintiffs appeal from the grant of summary judgment to the defendants in an antitrust class action charging price fixing in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. 156 F. Supp. 2d 1017 (C.D. Ill. 2001). The defendants are the principal manufacturers of high fructose corn syrup (HFCS)—Archer Daniels Midland (ADM), A.E. Staley, Cargill, American Maize-Products, and CPC International (which has settled with the plaintiffs, however, and thus is no longer a party). The plaintiffs represent a certified class consisting of direct purchasers from the defendants.

HFCS is a sweetener manufactured from corn and used in soft drinks and other food products. There are two grades, HFCS 42 and HFCS 55, the numbers referring to the percent-

age of fructose. HFCS 55, which constitutes about 60 percent of total sales of HFCS, is bought mostly by producers of soft drinks, with Coca-Cola and Pepsi-Cola between them accounting for about half the purchases. But many purchasers, of both grades of HFCS, are small. Industry sales exceeded $1 billion a year during the relevant period.

The plaintiffs claim that in 1988 the defendants secretly agreed to raise the prices of HFCS, that the conspiracy was implemented the following year, and that it continued until mid-1995 when the FBI raided ADM in search of evidence of another price-fixing conspiracy. Billions of dollars in treble damages are sought; we do not know whether the plaintiffs are also seeking injunctive relief, whether against renewal of the conspiracy, specific practices left in its wake (such as the 90 percent rule, of which more shortly), or both. The suit was brought in 1995 and though an enormous amount of evidence was amassed in pretrial discovery, the district judge concluded that "no reasonable jury could find in [the plaintiffs'] favor on the record presented in this case without resorting to pure speculation or conjecture." The soundness of this conclusion is the basic issue presented by the appeal.

Section 1 of the Sherman Act forbids contracts, combinations, or conspiracies in restraint of trade. This statutory language is broad enough, as we noted in *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 780 (7th Cir. 1999), to encompass a purely tacit agreement to fix prices, that is, an agreement made without any actual communication among the parties to the agreement. If a firm raises price in the expectation that its competitors will do likewise, and they do, the firm's behavior can be conceptualized as the offer of a unilateral contract that the offerees accept by raising their prices. Or as the creation of a contract implied in fact. "Suppose a person walks into a store and takes a news-

paper that is for sale there, intending to pay for it. The circumstances would create a contract implied in fact" even though there was no communication between the parties. *A.E.I. Music Network, Inc. v. Business Computers, Inc.*, No. 01-1650, 2002 WL 1033947, at *3 (7th Cir. May 22, 2002). Nevertheless it is generally believed, and the plaintiffs implicitly accept, that an express, manifested agreement, and thus an agreement involving actual, verbalized communication, must be proved in order for a price-fixing conspiracy to be actionable under the Sherman Act. See, e.g., *Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 50-51 (7th Cir. 1992); *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1443 (9th Cir. 1995); *Clamp-All Corp. v. Cast Iron Soil Pipe Institute*, 851 F.2d 478, 484 (1st Cir. 1988); *E.I. Du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 139 (2d Cir. 1984); John E. Lopatka, "Solving the Oligopoly Problem: Turner's Try," 41 *Antitrust Bull.* 843, 896-903 (1996).

Because price fixing is a per se violation of the Sherman Act, an admission by the defendants that they agreed to fix their prices is all the proof a plaintiff needs. In the absence of such an admission, the plaintiff must present evidence from which the existence of such an agreement can be inferred—and remember that the plaintiffs in this case concede that it must be an explicit, manifested agreement rather than a purely tacit meeting of the minds. The evidence upon which a plaintiff will rely will usually be and in this case is of two types—economic evidence suggesting that the defendants were not in fact competing, and noneconomic evidence suggesting that they were not competing because they had agreed not to compete. The economic evidence will in turn generally be of two types, and is in this case: evidence that the structure of the market was such as to make secret price fixing feasible (almost any market can be cartelized if the law permits sellers to establish formal, overt mechanisms for colluding, such as exclusive sales

agencies); and evidence that the market behaved in a noncompetitive manner. Neither form of economic evidence is strictly necessary, see *United States v. Andreas*, 216 F.3d 645, 666 (7th Cir. 2000), since price-fixing agreements are illegal even if the parties were completely unrealistic in supposing they could influence the market price. But economic evidence is important in a case such as this in which, although there is noneconomic evidence, that evidence is suggestive rather than conclusive.

In deciding whether there is enough evidence of price fixing to create a jury issue, a court asked to dismiss a price-fixing suit on summary judgment must be careful to avoid three traps that the defendants in this case have cleverly laid in their brief. The first is to weigh conflicting evidence (the job of the jury), and is illustrated by a dispute between the parties over testimony by an executive of A.E. Staley that Coca-Cola, a major customer, suggested that the prices of HFCS 42 and HFCS 55 be fixed in a ratio of 9 to 10. The fact that the defendants all adopted this ratio is part of the plaintiffs' evidence of conspiracy, and the inference of conspiracy would be weakened if the initiative for the adoption had come from a customer. The defendants treat the Staley testimony as uncontradicted because Coca-Cola's witness did not deny having suggested the 9:10 ratio but instead testified that he didn't recall having suggested it and was not aware of his company's ever having such a preference. The absence of a flat denial by Coca-Cola's witness of the Staley testimony would not as the defendants contend require a reasonable jury to accept that testimony, which is self-serving, uncorroborated, implausible (because the defendants achieved the ratio by raising the price of HFCS 42 rather than by lowering the price of HFCS 55, so Coca-Cola could not have benefited unless it just bought 55 and a competitor 42, which is not suggested), and inconsistent with the overall evidence of conspiracy, which as we shall

see was abundant although not conclusive. A plaintiff cannot make his case just by asking the jury to disbelieve the defendant's witnesses, but there is much more here. The defendants' handling of the 90 percent issue illustrates how the statement of facts in the defendants' brief combines a recital of the facts favorable to the defendants with an interpretation favorable to them of the remaining evidence; and that is the character of a trial brief rather than of a brief defending a grant of summary judgment.

The second trap to be avoided in evaluating evidence of an antitrust conspiracy for purposes of ruling on the defendants' motion for summary judgment is to suppose that if no single item of evidence presented by the plaintiff points unequivocally to conspiracy, the evidence as a whole cannot defeat summary judgment. It is true that zero plus zero equals zero. But evidence can be susceptible of different interpretations, only one of which supports the party sponsoring it, without being wholly devoid of probative value for that party. Otherwise what need would there ever be for a trial? The question for the jury in a case such as this would simply be whether, when the evidence was considered as a whole, it was more likely that the defendants had conspired to fix prices than that they had not conspired to fix prices. E.g., *In re Brand Name Prescription Drugs Antitrust Litigation*, 186 F.3d 781, 787 (7th Cir. 1999).

The third trap is failing to distinguish between the existence of a conspiracy and its efficacy. The defendants point out that many of the actual sales of HFCS during the period of the alleged conspiracy were made at prices below the defendants' list prices, and they intimate, without quite saying outright, that therefore even a bald-faced agreement to fix list prices would not be illegal in this industry. (Their brief states, for example, that "list prices are irrelevant here because the vast majority of HFCS sales were *not* made at

list price" (emphasis in original).) That is wrong. An agreement to fix list prices is, as the defendants' able counsel reluctantly conceded at the argument of the appeal, a per se violation of the Sherman Act even if most or for that matter all transactions occur at lower prices. Anyway sellers would not bother to fix list prices if they thought there would be no effect on transaction prices. Many sellers are blessed with customers who are "sleepers," that is, customers who don't shop around for the best buy; and even for those who do bargain for a lower price, the list price is usually the starting point for the bargaining and the higher it is (within reason) the higher the ultimately bargained price is likely to be. The defendants acknowledge that their "price lists served a useful purpose." The only useful purpose they might serve is as a guide to likely transaction prices. What is true is that if many sales are made at prices below the list price, the fact that the sellers' list prices are the same is not compelling proof of collusion. See *Reserve Supply Corp. v. Owens-Corning Fiberglas Corp., supra*, 971 F.2d at 53-54. But it wouldn't be anyway, since identical list prices might be adopted by imitation rather than by explicit agreement.

Let us turn to the evidence that the HFCS market is one in which secret price fixing might actually have an effect on price and thus be worth attempting. The fact that price fixing has to be kept secret in order to avoid immediate detection followed promptly by punishment tends to rule out price fixing in markets that have many sellers selling a product heterogeneous with regard to quality and specifications and having good substitutes in production or consumption; that are concentrated on the buying side, enabling the buyers to tempt sellers to shade any agreed-upon price in order to obtain a big bloc of business; and that have other characteristics, unnecessary to detail here, that make

it irrational to run the legal and business risks of fixing prices.

The plaintiffs' economic expert opined in his report and the defendants pretty much concede that the structure of the HFCS market, far from being inimical to secret price fixing, is favorable to it. We need not go into great detail on the point as it is not seriously contested. There are few sellers of HFCS. The five original defendants (recall that one has now settled with the plaintiffs) accounted during the period of the alleged conspiracy for 90 percent of the sales of the product. Therefore elaborate communications, quick to be detected, would not have been necessary to enable pricing to be coordinated. And if one seller broke ranks, the others would quickly discover the fact, and so the seller would have gained little from cheating on his coconspirators; the threat of such discovery tends to shore up a cartel. In addition, the product, HFCS, is highly standardized. Remember that there are only two grades, 42 and 55; and both are uniform. So colluding sellers would not have to agree not only on price but also on quality, design, post-sale services, and the like. This is another reason why a successful conspiracy would not require such frequent communications as to make prompt detection likely. There also are no close substitutes for HFCS. Not that there aren't plenty of other sweeteners, such as sugar; but apparently they are not perceived as close substitutes by soft-drink manufacturers and other purchasers of HFCS. An attempt to raise price above cost would not be likely to come to grief by causing a hemorrhage of business to sellers in other markets.

And the defendants had a lot of excess capacity, a condition that makes price competition more than usually risky and collusion more than usually attractive. When a market's productive capacity exceeds the demand for the market's product, a very low price will cover the incremental cost

of additional output because capacity will not have to be expanded in order to enable additional production. Competition will tend to drive price down to that level because any price above it will make some contribution to the seller's fixed costs (the costs that do not vary with output, such as the cost of building the seller's plant). But it will not be remunerative pricing, because it will not cover those costs in full. A seller might have a huge debt (a fixed cost, because owed regardless of how much the seller produces) because of its huge underutilized plant and yet find it impossible to service the debt because competition from other firms also cursed with excess capacity and so also desperate to find buyers who will pay a price that makes *some* contribution to their heavy fixed costs had driven its price down to, or very near, the incremental cost of its output. Suppose for example that the average total cost of some quantity $X$ of HFCS is \$10, but the incremental cost required to sell $X$ more of HFCS is only \$5. Then at any price above \$5, even if it is below \$10, a sale will make some contribution to covering the seller's fixed costs. If several sellers with similar cost structures are competing, the tendency will be to drive the market price all the way down to \$5, which will prevent the sellers from covering their total costs and thus confront them with the risk of bankruptcy. Conversely, precisely because of the discrepancy between total and variable cost, an agreement among the sellers that eliminates price competition will generate revenues enormously in excess of variable cost and so go far to stave off the threat of bankruptcy. And so the sellers will have a big incentive to fix prices.

As our numerical example suggests, the significance of excess capacity depends on the ratio of fixed to variable costs. If it is very low, the impact on the firms' solvency of competition that forces price down to variable costs may be slight. This is so far an unexplored issue in the litigation.

The defendants continued to add to their capacity during the period of the alleged conspiracy. This behavior does not disprove the existence of the conspiracy, as the defendants argue. Maintenance of excess capacity discourages new entry, which supracompetitive prices would otherwise attract, and also shores up a cartel by increasing the risk that its collapse will lead to a devastating price war ending in the bankruptcy of some or all of the former cartelists.

The principal features of the HFCS market that might seem to bear against an inference that secret price fixing was feasible and attractive during the period of the alleged conspiracy are, first, that HFCS is sold under two different types of contract: straight sale, and what are called "tolling agreements." Under the latter, the customer buys the corn and hires one of the sellers of HFCS to manufacture it into HFCS. That sounds like something that would greatly complicate an HFCS price-fixing conspiracy, but there is evidence that it did not. It seems that the only practical difference between the two forms of sale is that the tolling agreement shifts the risk of a change in the raw-material cost (the cost of the corn) from seller to buyer. Prices under the two arrangements are highly correlated and the price of the HFCS net of the cost of the corn is easily determined, so that sellers could not easily cheat on a price-fixing agreement by reducing the price of their tolling contracts.

Second, there are some very large buyers of HFCS, notably Coca-Cola and Pepsi-Cola, and, as theory predicts, they drove hard bargains and obtained large discounts from the list price of HFCS 55. But it does not follow that the defendants could not and did not fix the price of HFCS 55. There is a difference between a market in which all or virtually all the buyers are large and one in which there are some large and some small buyers. Suppose the buying side of the HFCS market were as concentrated as the selling side,

meaning that five firms bought 90 percent of all the HFCS sold. They would be able to whipsaw the sellers into granting large discounts, and probably therefore any effort at fixing prices would quickly collapse. When instead there are some large and some small buyers, which is the situation here, this need not prevent price fixing; it may simply cause the price fixers to engage in price discrimination, giving large discounts to the big buyers and no (or small) discounts to the small ones.

Market-wide price discrimination is a symptom of price fixing when, as in this case, the product sold by the market is uniform. *In re Brand Name Prescription Drug Antitrust Litigation*, 288 F.3d 1028, 1030-31 (7th Cir. 2002). If the product is differentiated and as a result each seller has a little pocket of monopoly power, enabling it to charge some of its customers a price above cost without their switching to its competitors, no inference of collusion can be drawn from the fact that the sellers are all discriminating. *Id.* In this case, however, the product is uniform (a "commodity"), so that competition would be expected to prevent any one seller from raising his price to any of his customers above his cost. If sellers are competing in the sale of an identical product which costs each of them $1 to produce (including in cost the market return on equity capital, "profit" in a financial though not in an economic sense), so that the competitive price, which is the market price because the sellers are competing, is $1, no one of them can sell his product to some of his customers for $2, for they can buy from his competitors for $1—unless the sellers collude, and agree not to cut price to the disfavored buyers. This is a highly simplified example, obviously. It ignores and the parties do not discuss the possible erosion of price discrimination by arbitrage, that is, by the favored buyers' buying more than they need and reselling the excess to the disfavored, a process that may continue until all buyers obtain the seller's product

at the same price. *Id.* But the example does illustrate an economic logic that favors the plaintiffs.

We turn now to the evidence of noncompetitive behavior, as distinct from evidence that the structure of the market was conducive to such behavior. Early in 1988, which is to say at the outset of the alleged conspiracy, ADM announced that it was raising its price for HFCS 42 to 90 percent of the price of HFCS 55, and the other defendants quickly followed suit. The defendants offer various explanations, of which the most plausible is that HFCS 42 is 90 percent as sweet as HFCS 55. Even if this is correct (there is evidence that the true percentage is only 71 percent), it does not counter an inference of price fixing. In a competitive market, price is based on cost rather than on value. Therefore the fact that buyers of HFCS are willing to pay more for HFCS 55 than for HFCS 42 because it is sweeter just shows that a monopolist or cartel could charge more for the higher grade whereas competition would bid price down to cost. (That was our $1-$2 example; the fact that some customers would pay $2 did not make that a competitive price.) Under competition, if the cost of the lower grade were, say, half the cost of the higher, so would the price be. There is no evidence that HFCS 42 costs 90 percent as much to produce as HFCS 55. Nor is there any evidence that industry-wide adoption of the 90 percent rule followed or anticipated a change in relative costs. In fact, the evidence suggests that it costs only 65 percent as much to manufacture HFCS 42, implying that under competition its price would be 65 percent—not 90 percent—of the price of HFCS 55.

A few months after the adoption of the 90 percent rule, the defendants switched from making contracts with their customers that specified the contract price for an entire year to contracts in which price was negotiated quarterly. They did this although virtually all their customers preferred

the former system in order to minimize risk. In other words, the defendants shifted risk to their customers (the sort of thing the tolling agreements did for customers who bought under those agreements) at the same time that, according to evidence discussed below, the defendants were raising their prices net of cost, rather than lowering them to compensate the customers for assuming additional risk. That is not competitive behavior.

There is evidence that defendants bought HFCS from one another even when the defendant doing the buying could have produced the amount bought at a lower cost than the purchase price. There is nothing suspicious about a firm's occasionally buying from a competitor to supply a customer whom the firm for one reason or another can't at the moment supply. The firm would rather buy from a competitor to supply its customer than tell the customer to buy from the competitor, lest the customer never return. But if the firm *could* supply its customer (remember there was a lot of excess capacity in the HFCS industry during the period of the alleged conspiracy) *and* at a lower cost than its competitor would charge, why would it buy from the competitor rather than expanding its own production? The possibility that springs immediately to mind is that this is a way of shoring up a sellers' cartel by protecting the market share of each seller. A seller who experiences a surge in demand, but meets the surge by buying what it needs from another seller rather than by expanding its own production, protects the other firm's market share and so preserves peace among the cartelists. It is pertinent to note that these inter-competitor transactions ended with the end of the alleged conspiracy.

In part because of those transactions the market shares of the defendants changed very little during the period of the alleged conspiracy, which is just what one would

expect of a group of sellers who are all charging the same prices for a uniform product and trying to keep everyone happy by maintaining the relative sales positions of the group's members. This evidence probably does not deserve as much weight as the plaintiffs give it. They don't point us to any evidence of how market shares fluctuated before or after the period of the alleged conspiracy; and without such evidence there is no benchmark against which to assess the stability of the defendants' market shares during that period. But it is something, the evidence of stable market shares, for two reasons. First, had they gyrated wildly, this would be some evidence of active competition. The defendants argue that they did gyrate wildly, but their evidence involves comparing pre-conspiracy (1988) market shares with market shares during the period of the alleged conspiracy (the district court followed them in this mistake). If, consistent with that evidence, the gyrations moderated during the period of the alleged conspiracy, this would be evidence for the plaintiffs.

Second and much more important, the output of HFCS grew during this period and one might expect that growth to have brought about changes in market shares; for it would be unlikely that all the sellers had the same ability to exploit the new sales opportunities opened by the growing demand. This is why a growth in demand usually makes it more difficult for a cartel to hold together than if demand is steady. If demand is growing it is difficult for a seller to determine whether a decline in its market share is due to cheating by another member of the cartel or just to the superior ability of some other member or members of the cartel to attract new business without cutting price. The defendants emphasize *that* point but fail to acknowledge that the fact that market shares did not fluctuate significantly during the period of the alleged HFCS conspiracy may indicate that the sellers had agreed tacitly or

otherwise to share the sales opportunities created by the growth in demand. This is conjecture, but conjecture has its place in building a case out of circumstantial evidence.

The plaintiffs' economic expert witness conducted a regression analysis that found, after correcting for other factors likely to influence prices of HFCS, that those prices were higher during the period of the alleged conspiracy than they were before or after. (More precisely, the independent variable that the expert labeled CONSPIRE, which took a value of 1 during the period of the alleged conspiracy and a value of 0 before and after that period, was found to have a positive and statistically significant effect on the dependent variable, which was price.) The judge deemed the analysis admissible as evidence, thus certifying it as the responsible though of course not necessarily correct work of a qualified professional. See *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-95 (1993). The defendants presented a competing regression analysis done by one of their economic experts, who added a couple of variables to the analysis of the plaintiffs' expert and, presto, the CONSPIRE variable ceased to be statistically significant. The plaintiffs rebutted with still another expert, who pointed out correctly that adding variables that are correlated with the variable of interest can make the effect of the latter disappear—to which the defendants reply, also correctly, that there are statistical methods for solving this problem (the problem of multicollinearity, as it is called by statisticians). They argue that their expert solved it and the plaintiffs argue that he did not and also that there was no statistical rationale for adding those other variables in the first place. Resolving this dispute requires a knowledge of statistical inference that judges do not possess. Later we'll suggest a method for resolving it. But in the present state of the record we must accept that the plaintiffs have presented some admissible evidence that higher prices during the period of the

alleged conspiracy cannot be fully explained by causes consistent with active competition, such as changes in the price of corn. For the same reason, we are disinclined to second guess, as the plaintiffs invite us to do, the district judge's refusal to exclude under the *Daubert* standard the reports of the defendants' experts.

To summarize the discussion to this point, there is evidence both that the HFCS market has a structure that is auspicious for price fixing and that during the period of the alleged conspiracy the defendants avoided or at least limited price competition. But as the defendants point out (when they are not arguing, inconsistently, that the industry was in fact fiercely competitive), all of this evidence is consistent with the hypothesis that they had a merely tacit agreement, which at least for purposes of this appeal the plaintiffs concede is not actionable under section 1 of the Sherman Act. The question then becomes whether there is enough evidence for a reasonable jury to find that there was an explicit agreement, not merely a tacit one. To repeat, there is evidence that the defendants were not competing; we might go so far as to say they had tacitly agreed not to compete, or at least to compete as little as possible; but the plaintiffs must prove that there was an actual, manifest agreement not to compete. Another and equivalent way to put this is that they must present evidence that would enable a reasonable jury to reject the hypothesis that the defendants foreswore price competition without actually agreeing to do so. See, e.g., *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

More evidence is required the less plausible the charge of collusive conduct. In *Matsushita*, for example, the charge was that the defendants had conspired to lower prices below cost in order to drive out competitors, and then to raise prices to monopoly levels. This was implausible for a vari-

ety of reasons, such as that it would mean that losses would be incurred in the near term in exchange for the speculative possibility of more than making them up in the uncertain and perhaps remote future—when, moreover, the competitors might come right back into the market as soon as (or shortly after) prices rose above cost, thus thwarting the conspirators' effort at recouping their losses with a commensurate profit. But the charge in this case involves no implausibility. The charge is of a garden-variety price-fixing conspiracy orchestrated by a firm, ADM, conceded to have fixed prices on related products (lysine and citric acid) during a period overlapping the period of the alleged conspiracy to fix the prices of HFCS. See *United States v. Andreas, supra*, 216 F.3d at 650-54; *In re Citric Acid Litigation*, 996 F. Supp. 951, 953-54 (N.D. Cal. 1998), aff'd, 191 F.3d 1090 (9th Cir. 1999).

We shall now summarize the evidence of explicit agreement, first noting however that the district judge refused to consider any of this evidence because he thought its character was such as to "require that a substantial inference be drawn in order to have evidentiary significance." This is correct in the sense that no single piece of the evidence that we're about to summarize is sufficient in itself to prove a price-fixing conspiracy. But that is not the question. The question is simply whether this evidence, considered as a whole and in combination with the economic evidence, is sufficient to defeat summary judgment. The judge may have been confused by the language found in cases such as *In re Baby Food Antitrust Litigation*, 166 F.3d 112, 118 (3d Cir. 1999), that "direct evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." We tried in *Troupe v. May Department Stores Co.*, 20 F.3d 734, 736-37 (7th Cir. 1994), to straighten out the confusing (and, as it seems to us, largely if not entirely superfluous) distinction

between direct and circumstantial evidence. The former is evidence tantamount to an acknowledgment of guilt; the latter is everything else *including* ambiguous statements. These are not to be disregarded because of their ambiguity; most cases are constructed out of a tissue of such statements and other circumstantial evidence, since an outright confession will ordinarily obviate the need for a trial.

Here at any rate is the plaintiffs' evidence, which the district judge should not have disregarded, that there was an explicit agreement to fix prices: One of Staley's HFCS plant managers was heard to say: "We have an understanding within the industry not to undercut each other's prices." (He was commenting on a matter within the scope of his employment and his comment was therefore admissible as an admission by a party. Fed. R. Evid. 801(d)(2)(D).) A Staley document states that Staley will "support efforts to limit [HFCS] pricing to a quarterly basis." Presumably the reference is to efforts by its competitors. The president of ADM stated that "our competitors are our friends. Our customers are the enemy." This sentiment, which will win no friends for capitalism, was echoed by a director of Staley's parent company who said in a memo to Staley executives that "competitors['] happiness is at least as important as customers['] happiness." A director of Staley was reported to have said that "*every* business I'm in is an organization" (emphasis added)—which sounds innocuous enough, but he said it in reference to the conspiracy to fix the price of lysine ("lysine is an organization") and so in context it appears that "organization" meant price-fixing conspiracy. Michael Andreas, the vice chairman and executive vice president of ADM, said: "What are you gonna tell [Keough, the recently retired president of Coca-Cola], that we gotta [i.e., have a] deal with . . . our two biggest competitors to fuck ya over[?]" Andreas, a principal figure in the lysine and citric-acid price-fixing conspiracies, also referred to Cargill's pres-

ident as a "friendly competitor" and mentioned an "under-standing between the companies that . . . causes us not to . . . make irrational decisions." In a discussion with a Japanese businessman indicted along with Andreas for fixing the price of lysine, Andreas compared the relations between ADM and Cargill to those between Mitsubishi and Mitsui, two Japanese conglomerates widely believed to fix prices and allocate markets. Julie A. Shepard, Comment, "Using United States Antitrust Laws Against the Keiretsu as a Wedge Into the Japanese Market," 6 *Transnat'l Lawyer* 345, 349-50 (1993).

A handwritten Cargill document refers under the heading "competitors" to "entry of new entrants (barriers) and will they play by the rules (discipline)." A price-fixing conspiracy increases the attractiveness of entry into a market by creating a wedge between price and cost. And so conspirators will naturally worry whether, if there is entry, the new entrant will join rather than compete with the conspiracy and, if he refuses to join, whether the conspirators can punish him in some way. This is not the only possible interpretation of the document, but it is a plausible one.

Shortly after the FBI raided ADM's headquarters seeking evidence of the company's involvement in the lysine and citric-acid conspiracies, Terrence Wilson, the head of ADM's corn processing division—the division responsible for HFCS as well as for the other two products—said he didn't know "what other companies [the FBI] hit. . . . I don't know . . . if they hit Staley or not." Since Staley did not manufacture lysine or citric acid, but did of course manufacture HFCS, Wilson may have been expressing a concern that the FBI would uncover evidence of an HFCS price-fixing conspiracy as well. It is further worth noting that the alleged HFCS conspiracy began shortly after Wilson became head of ADM's corn products division—which raises the question why, if as the defendants argue the 90 percent rule

and the other parallel behavior that is the plaintiffs' evidence of a lack of price competition in the HFCS market were just the natural expression of the oligopolistic structure of the market, this behavior should have begun when Wilson, later to be imprisoned for price fixing, took charge of ADM's HFCS operations. There may be an answer (pure coincidence, perhaps, or a change in the structure of the HFCS industry that suddenly made tacit collusion more attractive)—a point with general application to our review of the evidence that favors the plaintiffs—but its adequacy presents a genuine issue of material fact and therefore cannot be determined on summary judgment. And in a civil case price fixing need be proved only by a preponderance of the evidence.

There is some more evidence of the kind we've just been discussing, that is, evidence of explicit agreement, and other economic evidence as well that bolsters the plaintiffs' case, evidence for example that ADM had significant ownership interests in two of the other defendants. But we can stop here because the evidence that we have summarized would have been enough to enable a reasonable jury to infer that the agreement to fix prices was express rather than tacit. The evidence is not conclusive by any means—there are alternative interpretations of every bit of it—but it is highly suggestive of the existence of an explicit though of course covert agreement to fix prices.

But there is one more piece of evidence that we do have to discuss because it was the subject of an evidentiary ruling that the plaintiffs challenge. After Andreas and Wilson were convicted and sent to prison for fixing the price of lysine, the plaintiffs deposed them and asked them whether they had fixed prices of HFCS as well. They (along with a third executive of ADM) refused to answer, on the ground that their answers might incriminate them. The general rule is

that an adverse inference may be drawn from such a refusal in a civil case, *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *Harris v. City of Chicago*, 266 F.3d 750, 753 (7th Cir. 2001); *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 389-91 (7th Cir. 1995), though of course the district judge retains his general power under Fed. R. Evid. 403 to exclude relevant evidence if its probative value is clearly outweighed by (so far as relevant here) its capacity to confuse the jury. Without referring to the rule, the district judge ruled the evidence of the deponents' silence inadmissible because the three had refused to answer *any* substantive question, so that, the judge reasoned, no inference could be drawn from their refusal to answer questions about the alleged HFCS price-fixing conspiracy, at least in the absence of other evidence of such a conspiracy. But there *was* other evidence, as we have just seen.

The deeper problem with the judge's ruling is that it assumes that a person has carte blanche by virtue of the Fifth Amendment's self-incrimination clause to refuse to answer questions. The assumption is incorrect. To be privileged by the Fifth Amendment to refuse to answer a question, the answer one would give if one did answer it (and answer it truthfully) must have *some* tendency to subject the person being asked the question to criminal liability. E.g., *United States v. Apfelbaum*, 445 U.S. 115, 128 (1980); *United States v. Warner*, 830 F.2d 651, 656 (7th Cir. 1987); *United States v. Verkuilen*, 690 F.2d 648, 654 (7th Cir. 1982); *United States v. Reis*, 765 F.2d 1094, 1096 (5th Cir. 1985) (per curiam); compare *Sanchez v. Gilmore*, 189 F.3d 619, 624 (7th Cir. 1999). The fact that Andreas and Wilson were in prison for having fixed prices for lysine and citric acid would not have authorized them to invoke the Fifth Amendment if asked whether they had helped Richard III kill the little princes and bury them in the Tower of London. Andreas and Wilson had been convicted and sentenced for their role in the other

price-fixing conspiracies and had exhausted their appellate remedies. They faced no further jeopardy—unless truthful answers to questions about the HFCS conspiracy would have tended to show that ADM had conspired to fix the price of that product as well. That would justify and explain their taking the Fifth and it would also entitle a jury to treat their refusal to answer as evidence that there indeed was such a conspiracy.

The judge was correct that their refusal to answer could not be "imputed" to ADM, but imputation is not the issue. The issue is whether there was a conspiracy, and Andreas's and Wilson's refusal to answer the plaintiffs' questions was one more piece of evidence that there was and that it involved their former employer, ADM, one of the defendants in this case. So it was admissible against ADM though not against the other defendants despite the coconspirator exception to the hearsay rule. Fed. R. Evid. 801(d)(2)(E). The rule is applicable only to statements in furtherance of the conspiracy, and when Andreas and Wilson refused to speak the conspiracy was long over. Even if they were trying to conceal the conspiracy, this would not make their silence in furtherance of it, because efforts at concealing a conspiracy are not themselves part of the conspiracy. E.g., *Grunewald v. United States*, 353 U.S. 391, 404-06 (1957); *United States v. Masters*, 924 F.2d 1362, 1368 (7th Cir. 1991).

In affirming Andreas's conviction for his role in the other price-fixing conspiracies, this court remarked "an inexplicable lack of business ethics and an atmosphere of general lawlessness that infected the very heart of" ADM, whose senior executives "lied, cheated, embezzled, extorted and obstructed justice." *United States v. Andreas, supra*, 216 F.3d at 650. Since evidence of past crimes, or of other bad acts committed in the past, is inadmissible to prove that the defendant probably is guilty of whatever he is now being

charged with, merely because he has demonstrated a pro-
pensity to violate the law, Fed. R. Evid. 404(b), ADM's pre-
vious misconduct cannot be used as evidence that it partici-
pated in a conspiracy to fix the price of HFCS. But neither
can it be used, as the defendants wish to use it in this case,
to show that because the Justice Department has not moved
against the alleged HFCS price-fixing conspiracy, there must
not have been one. The Justice Department has limited re-
sources; in the entire decade of the 1990s, it brought fewer
than 200 civil antitrust cases, an average of fewer than 20
per year. It brought more criminal antitrust cases, but the
evidence in this case probably is not strong enough to estab-
lish the defendants' guilt beyond a reasonable doubt. With
Andreas and Wilson in jail and a bright spotlight of suspi-
cion shining on ADM and its competitors, the Department
may have felt that there was little to be gained, so far as
securing greater compliance with the Sherman Act was con-
cerned, by suing these defendants for fixing the price of
HFCS. It may also have felt that the antitrust class action bar
had both the desire and the resources to prosecute such a
suit vigorously, as indeed it has done. The evidence of the
defendants' guilt is weaker in this case than in the lysine
and citric-acid conspiracy cases, but not so weak as to justify
summary judgment in their favor.

The upshot of our analysis of the evidence is that unless
this opinion provides enough guidance to the parties to
enable them to converge in their estimates of the likely out-
come of a trial to the point at which settlement is feasible,
there must be a trial; and we are naturally concerned about
the practicability of a jury trial (the plaintiffs want and are
entitled to a jury) in a case with such a staggeringly large
record—the sealed exhibits alone fill 14 large boxes—that
includes so much highly technical statistical material. We
want to be realistic about the absorptive capacities of judges
and juries. But actually the complexity of the case is largely

illusory and a streamlined trial strikes us as eminently feasible. So far as the nonstatistical evidence is concerned, it is remarkable how little is in dispute. Most of the facts that we have recited in this opinion are not denied by the defendants; their quarrel with the plaintiffs is merely over the inferences to be drawn both from individual pieces of evidence and from the evidence considered as a whole. It is an undenied fact, for example, that an internal document of Cargill contains the statement "entry of new entrants (barriers) and will they play by the rules (discipline)." The only question is the meaning. When basic facts of the who-said-or-did-what-to-whom kind are agreed upon and only the inferences to be drawn from those facts are in dispute, the judge can streamline the trial by requiring the parties to stipulate to the undisputed facts and present the stipulations to the jury, rather than allowing the lawyers to bore everyone by eliciting uncontradicted facts by means of protracted direct examination and cross-examination of witnesses, as if they were dentists pulling teeth the old-fashioned way. See Federal Judicial Center, *Manual for Complex Litigation* § 21.47 (3d ed. 1995).

Turning to the technical statistical evidence (not the data themselves, which for the most part are uncontested, but the inferences drawn from them by the use of statistical methodology), we recommend that the district judge use the power that Rule 706 of the Federal Rules of Evidence expressly confers upon him to appoint his own expert witness, rather than leave himself and the jury completely at the mercy of the parties' warring experts. See *Manual for Complex Litigation, supra*, § 21.51; *Ford ex rel. Ford v. Long Beach Unified School District*, No. 00-56438, 2002 WL 1059884, at *4 (9th Cir. May 29, 2002); *Meister v. Medical Engineering Corp.*, 267 F.3d 1123, 1125 and n. 3 (D.C. Cir. 2001); *Walker v. American Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1071 (9th Cir. 1999). The main objection to this proce-

dure and the main reason for its infrequency are that the judge cannot be confident that the expert whom he has picked is a genuine neutral. The objection can be obviated by directing the party-designated experts to agree upon a neutral expert whom the judge will then appoint as the court's expert. See Daniel L. Rubinfeld, "Econometrics in the Courtroom," 85 *Colum. L. Rev.* 1048, 1096 (1985). The neutral expert will testify (as can, of course, the party-designated experts) and the judge and jury can repose a degree of confidence in his testimony that it could not repose in that of a party's witness. The judge and jurors may not understand the neutral expert perfectly but at least they will know that he has no axe to grind, and so, to a degree anyway, they will be able to take his testimony on faith.

No doubt in view of the complexity of the case the judge will also want to bifurcate the trial, that is, to have a trial on liability first and only if the jury finds that the defendants violated the law to conduct a trial to determine the plaintiffs' damages.

If these suggestions are followed, we think the case can be tried in a reasonable amount of time and be made comprehensible to a jury.

We do not mean to prejudge the outcome of the trial. We have construed the evidence as favorably to the plaintiffs as the record permits because that is how a grant of summary judgment in favor of defendants is reviewed. Maybe the defendants could convince a jury that the spin that their brief puts on the evidence is the correct one. We hold only that there is sufficient admissible evidence in support of the hypothesis of a price-fixing conspiracy to prevent the grant of summary judgment to the defendants. We trust that guided by this opinion the parties will make every effort to settle the case in advance of trial. And finally, although constrained to disagree with the district judge's decision to

grant summary judgment, we commend him for his painstaking analysis of the record and for his patient shepherding of this formidable litigation.

REVERSED AND REMANDED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*