UNITED STATES of America,
Plaintiff,

v.

ARCHER–DANIELS–MIDLAND COM-
PANY, and Minnesota Corn Pro-
cessors, LLC, Defendants.

No. CIV.A.02–1768 JDB.

United States District Court,
District of Columbia.

July 22, 2003.

Michael P. Harmonis, U.S. Department of Justice, Antitrust Division, Washington, DC, for U.S.

Paul B. Hewitt, Akin Gump Strauss Hauer & Feld LLP, Washington, DC, for Archer-Daniels-Midland Co.

Neil W. Imus, Vinson & Elkins, LLP, Washington, DC, for Minnesota Corn Processors, LLC.

### MEMORANDUM OPINION

BATES, District Judge.

The United States of America (the "government") brings this case against Archer–Daniels–Midland Company ("ADM") and Minnesota Corn Processors, LLC ("MCP") for antitrust violations arising out of the merger of those two companies. The government alleges that the transaction would substantially lessen competition in the highly concentrated markets for corn syrup and high fructose corn syrup ("HFCS"). Presently before the Court is the government's motion for entry of a proposed Final Judgment agreed upon by the parties. For the reasons stated below, the Court will grant the motion.

## I. BACKGROUND

### A. Defendants and the Proposed Transaction

ADM is a Delaware corporation with its principal offices in Decatur, Illinois. Competitive Impact Statement ("CIS") at 3. ADM is engaged in the processing and sale of agricultural products, including corn syrup and HFCS, which are produced at domestic plants in Iowa and Illinois. *Id.* In 2001, ADM had corn syrup sales of approximately $66 million and HFCS sales of approximately $480 million. *Id.*

MCP is a Colorado limited liability corporation with its principal offices in Minnesota. *Id.* MCP is involved in the agricultural processing and marketing business, and has corn syrup and HFCS processing facilities in Minnesota and Nebraska. *Id.* MCP's 2001 sales of corn syrup were approximately $56 million, and its HFCS sales totaled approximately $153 million. *Id.*

MCP sells its corn sweetener products through a joint venture with Corn Products International ("CPI"). *Id.* The joint venture, known as CornProductsMCP Sweeteners LLC ("CPMCP"), is the exclusive outlet for MCP's and CPI's corn syrup and HFCS products. *Id.*

On July 11, 2002, ADM and MCP entered into an agreement under which ADM would acquire MCP. *Id.* at 3–4.

### B. Corn Syrup and HFCS

Corn syrup and HFCS are both manufactured by wet mill processing of corn. *Id.* at 4. Wet mill processing involves soaking and grinding kernels to produce a starch slurry, followed by the addition of enzymes to convert the starch slurry to sugars such as dextrose and fructose. *Id.*

Corn syrup is used as a sweetener in the preparation of various food products, including confectionary, bakery, and dairy products, salad dressings, condiments, jams and jellies, lunch meats, canned foods, and vegetables. *Id.* Specific applications require different grades of corn syrup with different sweetening effect, and corn wet millers that manufacture corn syrup make most or all of the various grades of corn syrup. *Id.*

There are two grades of HFCS—HFCS 42 and HFCS 55—with the numbers referring to the percentage of fructose in the product. *Id.* HFCS 42 is used as a sweetener in jams, jellies, baked goods, canned goods, dairy products, and some beverages. *Id.* HFCS 55 is used mainly to sweeten soft drinks. *Id.*

Corn syrup, HFCS 42, and HFCS 55 are each distinct products without practical substitutes, differing from all other sweeteners and each other in their physical characteristics, means of production, uses, and pricing. *Id.* Although they are functionally interchangeable with sugar in

many applications, they are much less expensive and therefore are sweeteners of choice for many uses. *Id.* at 4–5; Compl. ¶ 13. Very few purchasers of corn syrup, HFCS 42, and HFCS 55 would switch to other sweeteners in response to a small but significant increase in price. Compl. ¶ 14.

### C. Alleged Harm to Competition as a Result of the Acquisition

The corn syrup and HFCS markets in the United States and Canada are highly concentrated. In fact, there are just five firms involved in the manufacture and sale of corn syrup, HFCS 42, and HFCS 55 in the United States and Canada (which the government maintains is the relevant market). CIS at 5. ADM accounts for 10% of all corn syrup manufacturing capacity, 33% of all HFCS 42 manufacturing capacity, and 25% of all HFCS 55 manufacturing capacity. *Id.* MCP, though CPMCP, accounts for more than 20% of all corn syrup manufacturing capacity, more than 15% of all HFCS 42 manufacturing capacity, and more than 15% of all HFCS 55 manufacturing capacity. *Id.*

The government charges that the markets in the United States and Canada will become substantially more concentrated if ADM acquires MCP and succeeds to MCP's position in its joint venture with CPI. *Id.* at 5. Competition between defendants in the corn syrup and HFCS markets will be eliminated, competition generally in the industry will lessen substantially, prices for corn syrup and HFCS will increase, and the amounts produced will fall. *Id.* at 5–6. In addition, the government highlights that a reduction in the number of independent contractors from five to four will increase the likelihood of anticompetitive coordination among the few remaining corn wet millers. *Id.* at 5. Moreover, entry by a new competitor would not be likely to prevent the harms to competition, because successful entry into the manufacture and sale of corn syrup, HFCS 42, and HFCS 55 is difficult, time consuming, and costly. *Id.*

### D. Procedural History

The government filed the complaint in this matter on September 6, 2002, alleging that the proposed acquisition of MCP by ADM violates Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18. The government also filed a Stipulation and Order between the parties, in which defendants consented to the terms of a proposed Final Judgment.

Under the proposed Final Judgment, defendants would agree to effect the dissolution of CPMCP by December 31, 2002, and provide appropriate written notice of their election to do so to the General Counsel of CPI. Further, concurrent with such written notice, defendants would, in writing, relieve CPI of any obligations to defendants or CPMCP to the full extent necessary to permit CPI to conduct independent operations in competition with defendants and CPMCP. Defendants would also refrain from selling, marketing, or pricing any products in cooperation or coordination with CPMCP or CPI, except to the extent necessary to ensure that CPMCP performed on existing contracts or commitments to its customers.

The proposed Final Judgment requires defendants to submit an affidavit 20 days after the filing of the Final Judgment, and every 30 days thereafter until the final accounting after the dissolution of CPMCP, concerning the fact and manner of compliance with the Final Judgment. The proposed Final Judgment also provides that the government may file an objection in response to the affidavits. In addition, the proposed Final Judgment provides: that defendants must maintain full records of the dissolution of CPMCP

for one year; that representatives of the Department of Justice, upon written request and reasonable notice, shall be permitted to interview defendants' personnel and access defendants' records relating to matters contained in the Final Judgment; and that defendants, upon the request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, shall be required to submit written reports relating to matters contained in the proposed Final Judgment. The proposed Final Judgment is to be effective for 10 years, absent extension, and this Court is to retain jurisdiction to modify, enforce, or issue appropriate orders concerning the Final Judgment.

Shortly after filing the proposed Final Judgment, and in accordance with Section 5(b) of the Clayton Act, as amended by Section 2 of the Antitrust Procedures and Penalties Act (codified at 15 U.S.C. §§ 16(b)-(h)), the government filed a Competitive Impact Statement ("CIS") describing the alleged antitrust concerns surrounding the ADM–MCP transaction and explaining the purpose of the proposed Final Judgment. According to the CIS, the proposed Final Judgment was designed to eliminate the anticompetitive effects resulting from the transaction and from ADM's succession to MCP's interest in the joint venture with CPI, and to preserve competition in the manufacture and sale of corn syrup and HFCS. CIS at 6. More specifically, the proposed Final Judgment was intended to accomplish three related goals: (1) to ensure, through the dissolution of CPMCP, that the acquisition does not reduce the number of independent competitors in the corn syrup and HFCS markets in the United States and Canada; (2) to ensure that CPI is permitted independently to market and sell corn

syrup and HCFS; and (3) to ensure that defendants compete independently of CPMCP and CPI. *Id.* As the CIS emphasizes, the proposed Final Judgment will ensure that the corn syrup and HFCS markets have the same number of competitors after the ADM–MCP transaction as they did before. *Id.* at 7.

Pursuant to 15 U.S.C. § 16(b), the government published the Complaint, the proposed Final Judgment, and the CIS in the Federal Register, and opened a 60–day public comment period commencing November 7, 2002. *See* 67 Fed.Reg. 67,864 (2002). Three comments were submitted. Thereafter, the government filed its response to the public comments in this Court, appending the actual comments as exhibits. The government now moves for entry of the proposed Final Judgment pursuant to 15 U.S.C. § 16(e).

## II. ANALYSIS

### A. Framework for Analysis

■ Before entering a consent judgment presented by the government, the court must "determine that the entry of such judgment is in the public interest." 15 U.S.C. § 16(e).[1] In making this determination, the court "may consider":

(1) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration or relief sought, anticipated effects of alternative remedies actually considered, and any other considerations bearing upon the adequacy of such judgment;

(2) the impact of entry of such judgment upon the public generally and individuals alleging specific injury from the violations set forth in the complaint includ-

---

1. In making the "public interest" determination, a court is not required to hold a hearing or conduct a trial. *United States v. Enova*

*Corp.,* 107 F.Supp.2d 10, 17 (D.D.C.2000). The Court does not believe that either is necessary here.

ing consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

*Id.*

■ The district court is not to serve as a "judicial rubber stamp[ ]," but rather must make "an independent determination as to whether or not entry of a proposed consent decree [is] in the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1458 (D.C.Cir.1995) (citations and internal quotation marks omitted). At the same time, the D.C. Circuit has "construed the public interest inquiry narrowly," *Mass. Sch. of Law at Andover, Inc. v. United States*, 118 F.3d 776, 783 (D.C.Cir. 1997), and has emphasized that a district court should approve a proposed consent decree if it is "within the **reaches** of the public interest," *United States v. Western Electric Co.*, 900 F.2d 283, 309 (D.C.Cir. 1990) (emphasis in original) (citation and internal quotation marks omitted).

■ A district court must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case. *See Microsoft*, 56 F.3d at 1461. Moreover, the court is not to review allegations and issues that were not contained in the government's complaint, *id.* at 1459, nor should it "base its public interest determination on antitrust concerns in markets other than those alleged in the government's complaint," *United States v. Pearson plc*, 55 F.Supp.2d 43, 45 (D.D.C.1999) (citing *United States v. BNS Inc.*, 858 F.2d 456, 462–63 (9th Cir. 1988)).

■ The court should bear in mind that a consent decree is the product of a negotiated settlement, *see United States v. Thomson Corp.*, 949 F.Supp. 907, 914 (D.D.C.1996), and that "there are no **findings** that the defendant has actually engaged in illegal practices," *Microsoft*, 56 F.3d at 1460–61 (emphasis in original). As

the D.C. Circuit has observed, "[r]emedies which appear less than vigorous may well reflect an underlying weakness in the government's case." *Id.* at 1461. "It is therefore inappropriate for the judge to measure the remedies in the decree as if they were fashioned after trial." *Id.* Ultimately, the district court should withhold approval of a consent decree "only if any of the terms appear ambiguous, if the enforcement mechanism is inadequate, if third parties will be positively injured, or if the decree otherwise makes 'a mockery of judicial power.' " *Mass. Sch. of Law at Andover*, 118 F.3d at 783 (quoting *Microsoft*, 56 F.3d at 1462).

In the instant case, there is nothing at all ambiguous or unclear about the proposed Final Judgment nor is the enforcement mechanism inadequate. In a nutshell, the decree requires MCP to dissolve its joint venture with CPI as a condition of the ADM–MCP transaction. The merged company is to provide proof of compliance to the government through affidavits, and is to maintain certain records and make itself available for appropriate inspection. The Court, in turn, is empowered to retain jurisdiction over the matter for the purpose of modifying the judgment or responding to alleged violations. It could hardly be disputed that the methods for carrying out and enforcing the terms of the proposed Final Judgment are entirely straight-forward.

The issues raised with respect to the proposed Final Judgment instead relate to the overall approach that the government has taken to the ADM–MCP transaction. Specifically, as part of the public comment process, Professor C. Carstensen of the University of Wisconsin, writing on behalf of himself as well as the National Farmers Union, the Organization for Competitive Markets, and several other professors, relayed concerns that the CIS was not ade-

quate, that the government did not fully consider the danger to competition in the ethanol market as a result of the ADM–MCP transaction, and that the proposed remedies do not address the full scope of anticompetitive concerns.[2]

## B. Adequacy of the CIS

The Tunney Act requires that a competitive impact statement recite:

(1) the nature and purpose of the proceeding;

(2) a description of the practices or events giving rise to the alleged violation of the antitrust laws;

(3) an explanation of the proposal for a consent judgment, including an explanation of any unusual circumstances giving rise to such proposal or any provision contained therein, relief to be obtained thereby, and the anticipated effects on competition of such relief;

(4) the remedies available to potential private plaintiffs damaged by the alleged violation in the event that such proposal for the consent judgment is entered in such proceeding;

(5) a description of the procedures available for modification of such proposal; and

(6) a description and evaluation of alternatives to such proposal actually considered by the United States.

15 U.S.C. § 16(b). At least at first blush, the CIS seems complete with respect to each of the six required elements and appears sufficient to enable the Court to proceed with the public interest determination. *See* CIS at 1–3 (explaining the nature and purpose of the proceeding); 3–6 (describing events that gave rise to the alleged violation of the antitrust laws); 6–7 (explaining the proposed Final Judgment); 7 (explaining remedies available to potential private plaintiffs); 7–8 (explaining procedures available for modifying the proposed Final Judgment); and 8 (describing and evaluating alternatives to the proposed Final Judgment). Nevertheless, Professor Carstensen alleges that the CIS is inadequate because it does not disclose certain participants' market shares in the corn syrup and HFCS markets, does not discuss ADM's ownership of a large percentage of one of its competitors, fails to report a decision by the U.S. Court of Appeals for the Seventh Circuit concerning anticompetitive conduct in the HFCS market, and fails to explain why the proposed remedy is adequate.[3]

 With respect to the first of these contentions, the specific criticism is that the CIS discloses only the market shares of MCP's and CPI's joint venture, not the market shares of MCP and CPI individually. But as the government notes in response, there is no legal requirement that a CIS set forth this data. It may be true that without the market share information, the change in the Herfindahl–Hirschman Index ("HHI")—a standard measure of market concentration—cannot be calculated. However, the allegation in the complaint here focuses on the small number of competitors in the industry and the enhanced possibility of successful anticompetitive coordination were one of the few competitors removed. The government

---

**2.** As noted above, there were three comments submitted during the public comment period. The Court will focus its discussion on the comment submitted by Professor Carstensen because the remaining two comments largely reiterate the concerns expressed by Professor Carstensen or raise issues relating to policy matters outside of the antitrust context.

**3.** As will become clear below, although Professor Carstensen claims to be attacking the adequacy of the CIS, some of his arguments are actually masked challenges to the government's proposed remedy.

maintains that the proposed Final Judgment, by ensuring the dissolution of CPMCP and the independent existence of CPI as a competitor, will ameliorate the increased danger of anticompetitive coordination, irrespective of the particular effects on HHI. CIS at 10–11. The government's view on this issue is entitled to some deference. *Microsoft*, 56 F.3d at 1461. The Court therefore concludes that the CIS's omission of certain market share data is of no special moment.

■ Professor Carstensen next argues that the CIS should have noted ADM's partial ownership of one its competitors. According to Professor Carstensen ADM directly or indirectly owns 25% of A.E. Staley ("Staley"), one of the leaders in the HFCS market.

This challenge fails. The government asserts that it had investigated the ADM–Staley connection and determined that ADM's stake in Staley was too small to give it control or influence over Staley's business decisions, allow it access to Staley's competitively sensitive information, or undermine its incentive to compete aggressively with Staley. Indeed, according to the government, ADM's direct or indirect ownership of Staley is not 25%, as Professor Carstensen alleges, but is less than 16%. Moreover, its share of Staley's profits is less than 10%. CIS at 12–13. The government concluded based on its investigation that ADM and Staley operate as independent competitors, and thus did not believe it necessary to discuss any relationship between ADM and Staley in the CIS.

The Court finds this explanation satisfactory. The government is not required to include in the CIS information concerning every potential antitrust concern that it has discarded as baseless after investigation. Here, the government, after exploring the issue, concluded that the ADM–Staley relationship was not of signif-icant enough concern to warrant disclosure in the CIS. This decision appears to be well-founded and does not provide grounds for withholding entry of the proposed Final Judgment at this time.

■ Professor Carstensen proceeds to argue that the CIS should have included a discussion of the Seventh Circuit's decision in *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651 (7th Cir. 2002) ("*HFCS Litigation*"). In that case, the Seventh Circuit concluded that there was "evidence both that the HCFS market has a structure that is auspicious for price fixing and that during the period of the alleged conspiracy the defendants avoided or at least limited price competition." *Id.* at 661. The court further concluded that there was enough evidence to enable a reasonable jury to conclude that there was express agreement among competitors in the HFCS market to fix prices. *Id.* at 663. In light of these conclusions, Professor Carstensen urges, not only is omission from the CIS of any reference to the *HFCS Litigation* decision improper, but in addition, the proposed Final Judgment does not go far enough towards remedying potential anticompetitive behavior.

The Court disagrees. There is no requirement that a CIS relay the findings of courts that have reviewed allegations of anticompetitive behavior in the markets at issue. Moreover, the government's approach to the anticompetitive concerns here is not undermined by the conclusions of the *HFCS Litigation* court. To the contrary, the government's approach is informed by a principal factor noted by the Seventh Circuit—that the structure of the HFCS market makes it vulnerable to anticompetitive behavior. Here, by ensuring that the number of competitors in the HFCS market does not shrink from five to four as a result of the ADM–MCP merger, the government's proposed remedy direct-

ly addresses the dangers of increased anti-competitive coordination.

█ Professor Carstensen's final contention concerning the CIS—his allegation that it fails to explain the adequacy of the proposed remedy—is without merit. The CIS states plainly that "the decree will ensure that there are at least five independent competitors in the corn syrup and HFCS markets, and will preserve and encourage ongoing competition between ADM and CPI." CIS at 7. The CIS thus directly states how the proposed Final Judgment addresses the dangers of anticompetitive coordination and reduced competition alleged in the complaint.

## C. Alleged Concentration in the Ethanol Market

Professor Carstensen's most fervent challenge to the proposed Final Judgment is his argument that it fails to address or remedy increased concentration in the ethanol market as a result of the ADM–MCP transaction. Professor Carstensen discusses at length the nature of the ethanol market and anticompetitive concerns raised by the merger between ADM, the leading producer of ethanol with 30 to 50% of capacity, and MCP, which allegedly controls about 6% of the current capacity.

█ Whatever merit there may be to Professor Carstensen's concerns about concentration in the ethanol market,[4] those concerns are beyond the scope of this Court's review. The government's complaint focuses exclusively on the corn syrup and HFCS markets. It is not the place of this Court to reach outside the complaint to construct a "hypothetical case" relating to the ethanol market "and then

evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Indeed, in *Microsoft*, the D.C. Circuit firmly criticized the district court for rejecting a consent decree on the ground that it did not remedy certain anticompetitive practices where those practices were not, in fact, alleged in the complaint. *See id.* at 1458–61; *see also Enova*, 107 F.Supp.2d at 18 ("[A]ny potentially deleterious effect that the merger may have on California's natural gas market is ... beyond the allegations made and issues raised in the complaint and is therefore beyond the scope of this Court's review."). Under the unequivocal ruling in *Microsoft*, this Court cannot find that possible dangers of concentration in the ethanol market provide a basis for rejecting the consent decree.[5]

## D. Adequacy of the Proposed Remedy

█ Professor Carstensen asserts that the government did not consider alternative remedies and that its proposed remedy is inadequate. In his comment, he suggests that the government not only bar the ADM–MCP merger, but also force dissolution of MCP's joint venture with CPI and require ADM to divest its interest in one company through which it owns a stake in Staley.

The government properly notes that Professor Carstensen's suggested remedy goes beyond the allegations in the complaint, which targeted only the ADM–MCP merger, not MCP's joint venture, ADM's interest in Staley, or concentration in the corn syrup and HFCS markets more generally. It is self-evident that barring the

---

4. The government asserts in its brief that in the course of its investigation, it considered the implications of the acquisition in the ethanol market and found no evidence to support any credible theory of antitrust violation.

5. One member of the public submitted a comment expressing concern about the acquisition's effect on farm prices. That concern, too, goes beyond the scope of the complaint and thus does not provide grounds for rejecting the proposed Final Judgment.

merger alone would respond fully to the anticompetitive concerns raised by the merger because it would maintain the status quo. For the Court to require that the government take steps in addition to precluding the merger would exceed the Court's authority, which, of course, "depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place." *Microsoft*, 56 F.3d at 1459–60.

The government explains that it declined even to bar the acquisition because it believed that dissolution of the joint venture would effectively prevent the acquisition from having anticompetitive effects but would avoid the time, expense, and uncertainty of a trial. The government's predictions concerning the sufficiency of the proposed Final Judgment are entitled to respect. *See id.* at 1461. The Court certainly does not have " 'exceptional confidence that adverse antitrust consequences will result' " if the proposed Final Judgment is entered, *id.* at 1460 (citation omitted), and, indeed, by ensuring that five major players remain in the market following the merger, it seems reasonable that entering the proposed Final Judgment will eliminate the threats of easier anticompetitive coordination and diminished competition. There is no reason for the Court to conclude that the proposed Final Judgment makes " 'a mockery of judicial power.' " *Mass. Sch. of Law at Andover*, 118 F.3d at 783 (quoting *Microsoft*, 56 F.3d at 1462). To the contrary, the Court finds that the proposed Final Judgment is well "within the reaches of the public interest." *Western Electric Co.*, 900 F.2d at 309 (citation, internal quotation marks, and emphasis omitted).

## III. CONCLUSION

For the foregoing reasons, the government's motion for entry of final judgment is granted. The Final Judgment shall be entered by the Court in a separate order issued on this date.