In re: VITAMINS ANTITRUST
LITIGATION

This Document Relates To: All Actions

No. MISC. 99–197(TFH),
No. MDL 1285.

United States District Court,
District of Columbia.

April 8, 2004.

Stephen John Pollak, Shea & Gardner, Washington, DC, pro se.

Jodi Trulove, Kenneth L. Adams, Richard J. Leveridge, Elaine Metlin, Dickstein, Shapiro, Morin & Oshinsky, L.L.P., Jonathan David Schiller, Boies, Schiller & Flexner, LLP, Eric Sean Jackson, Robins, Kaplan, Miller & Ciresi, L.L.P., Bradley Stuart Lui, Morrison & Foerster, LLP, William James Bachman, John Edward Schmidtlein, Williams & Connolly, Frank Panopoulos, White & Case, L.L.P., Washington, DC, David H. Bamberger, Edward Smith Scheideman, Piper Rudnick, LLP, Philip Dean Bartz, Mckenna, Long & Aldridge & Norman, L.L.P., Brian A. Ratner, Cohen, Milstein, Hausfeld & Toll, PLLC, Robert Kenly Webster, Washington, DC, John W. Sharbrough, III, M. Stephen Dampier, Mary Elizabeth Snow, P. Dean Waite, Jr., The Sharbrough Law Firm, PC, Charles A. Graddick, Sims, Graddick & Dodson, P.C., Stephen L. Klimjack, Steven A. Martino, Jackson, Taylor, Martino & Hedge, Mobile, AL, Daniel S. Mason, Joseph W. Bell, Peter F. Burns, Sara M. Scott, Craig C. Corbitt, Zelle, Hofmann, Voelbel, Mason & Gette, L.L.P., Steven O. Sidener, Gold Bennett & Cera LLP, San Francisco, CA, Phillip A. Cole, Lommen, Nelson, Cole & Stageberg, P.A., K. Craig Wildfang, Robins, Kaplan, Miller & Ciresi, Andrew S. Birrell, Steven E. Uhr, Robins, Kaplan, Miller & Ciresi, Timothy J. Becker, Zimmerman Reed, P.L.L.P., Minneapolis, MN, John F. Kinney, Lee Allen Freeman, Freeman, Freeman & Salzman, P.C., Joseph Michael Vanek, Daar & Vanek, P.C., Chicago, IL, Bruce H. Simon, Cohen, Weiss and Simon, LLP, Lawrence Byrne, White & Case, Michael Orth Ware, Mayer, Brown, Rowe & Maw LLP, New York City, Kevin A. Bowman, Sebaly, Shillito & Dyer, Dayton, OH, Gordon Ball, Knoxville, TN, Trawick H. Stubbs, Jr., Stubbs & Perdue, PA, New Bern, CA, Michael James Flannery, The David Danis Law Firm, P.C., St. Louis, MO, Terri Chadick, Conner & Winters, P.L.L.C., Fayetteville, AR, Roberta D. Liebenberg, Fine, Kaplan & Black, Philadelphia, PA, M. Eric Frankovitch, Frankovitch, Anetakis, Colantonio & Simon, Steven M. Recht, Recht Law Offices, Weirton, WV, Richard Alan Arnold, Kenny, Nachwalter, Seymour, Arnold, Critchlow & Spector, PA, Miami, FL, C. Brooks Wood, Morrison & Heckler, LLP, Kansas City, MO, Robert II Heuck, Waite, Schneider, Bayless & Chesley, Cincinnati, OH, Dallas D. Ball, Ballentine, SC, for Plaintiffs.

## ORDER

THOMAS F. HOGAN, Chief Judge.

Pending before the Court is E.I. DuPont de Nemours & Company's Motion to Amend the Court's March 9, 2004 Memorandum Opinion Re: Defendants' Motion for Summary Judgment on the Issue of an All–Vitamins Conspiracy and Vacate the Order as to DuPont [# 4611]. The Court has carefully considered the motion as well as the opposition submitted by Publix and Meijer. For the reasons stated in the Amended Memorandum Opinion Re: Defendants' Motions for Summary Judgment on the Issue of an "All–Vitamins Conspiracy" issued April 8, 2004 [# 4619], it is hereby

**ORDERED** that the motion is **GRANTED.** It is further

**ORDERED** that the Order dated March 9, 2004 [# 4606] is **VACATED.** A new

Order is issued contemporaneously herewith.

**SO ORDERED.**

*AMENDED MEMORANDUM OPINION*

### Re: Defendants' Motions for Summary Judgment on the Issue of an "All–Vitamins Conspiracy"

Pending before the Court are five defendants' motions[1] for summary judgment seeking judgment on the issue of the scope of the conspiracy pursuant to Fed.R.Civ.P. 56. Upon careful consideration of the parties' briefs, arguments presented, and the entire record herein, the Court denies for certain Defendants and grants for one Defendant motions for summary judgment on Plaintiffs' "all-vitamins conspiracy" claim.[2]

### I. BACKGROUND

This case stands at the heels of one of the largest criminal antitrust investigations ever undertaken by the United States Department of Justice. To date, the Antitrust division of the Department of Justice has prosecuted 30 cases and gathered well over $875 million in criminal fines relating to the international vitamins cartel.[3] This vitamins cartel enacted one

---

1. Originally, the various defendants filed twenty-one (21) motions for summary judgment concerning the scope of the all-vitamins conspiracy. Many of these motions became moot as a result of settlement. The following defendants' motions remain at issue before the Court with respect to the direct action cases which are scheduled to be remanded:

 [# 11:] Bioproducts, Inc. ("Bioproducts")
 [# 13:] DuCon, DCV, Inc., DuCoa ("DuCoa")
 [# 16:] Chinook Group Limited and Chinook Group, Inc. ("Chinook")
 [# 17:] UCB S.A., UCB, Inc., and UCB Chemicals Corporation ("UCB")

 The defendant parties to this motion will collectively be referred to as "Defendants" or "choline Defendants." The individual defendant parties will be referred to as the names indicated in parenthesis above. The plaintiffs will be referred to as "Plaintiffs."

 The number listed before each defendant's name above refers to the August 14, 2002 list of dispositive motions from Dickstein, Shapiro, Morin & Oshinsky, LLP. There are additional motions concerning the all-vitamins conspiracy that will be addressed at a later date. These affect the so-called "indirect purchaser cases" which are on a separate scheduling track.

2. This opinion amends the Memorandum Opinion re: Defendants' Motions for Summary Judgment on the Issue of an "All–Vitamins Conspiracy" issued March 9, 2004. Specifically, the Court removes the holding as to E.I. DuPont de Nemours and Company ("DuPont") having granted Dupont's Motion to Amend the March 9, 2004 Memorandum Opinion.

 On August 6, 2002, DuPont filed a Motion for Partial Summary Judgment on the Issue of an All Vitamins Conspiracy in ten individual cases. At the time the March 9, 2004 Memorandum Opinion was issued, DuPont had settled with each of the plaintiffs against whom it had moved for summary judgment. DuPont failed, however, to inform the Court of the status of its motion. In the Proposed Agenda for February 18, 2004 Status Conference, DuPont's all-vitamins conspiracy motion was listed in section G as one of the "Dispositive Motions Before the Court that the Parties Agree Should Be Decided Prior to Remand." Furthermore, at the February 18, 2004 status conference, which DuPont's counsel chose not to attend, counsel for parties other than DuPont specifically addressed section G of the agenda confirming which listed motions had been mooted. *See* Tr. of Feb. 18, 2004 Status Conference at 25–27.

 The Court is loath to consider the number of hours and judicial resources that were wasted in deciding a motion, the moot status of which counsel neglected to timely inform the Court. In the interests of justice, however, the holding as to DuPont must be removed from this Memorandum Opinion in light of the settlements that had taken place before the original Memorandum Opinion was issued.

3. Press Release, United States Department of Justice, Former DuCoa Executive Charged With Price Fixing on Choline Chloride (June

of the most elaborate and wide-spread conspiracies ever prosecuted by the United States Department of Justice.[4]

The case before this Court is equally formidable. As of a few months ago, the consolidated action before the Court involved 55 separate multiparty lawsuits from 32 different federal courts. The enormity and complexity of this case can be seen through the fact that over 1,000 opinions and rulings have been issued by the Court in this case. Furthermore, well over 100 law firms participated in the preparation of over 10,000 separate filings that have been lodged in this matter to date. This opinion addresses five of the motions that have been filed in this case.

Plaintiffs allege that Defendants, along with their co-conspirators, conspired to artificially inflate the price of certain vitamins and vitamin products, allocate shares of the vitamin market, predetermine sales volume in the vitamin industry, eliminate competition from non-co-conspirators, limit supply, and allocate specific customers among themselves and their co-conspirators in the following vitamin markets: Vitamin A, Vitamin B1 (Thiamine), Vitamin B2 (Ribloflavin), Vitamin B3 (Niacin), Vitamin B4 (Choline Chloride), Vitamin B5 (CalPan), Vitamin B6 (Pyridoxine), Vitamin B9 (Folic Acid), Vitamin B12, Vitamin C, Vitamin D, Vitamin E, Vitamin H (Biotin), Astaxanthin, Beta Carotene, Canthaxonthin, Apocarotenal, and vitamin premix, in violation of Section 1 of the Sherman Act. See, e.g., Second Am. Compl. for Antitrust Violations, Blue Seal Feeds, Inc., et al., v. BASF A.G., et al., ¶¶ 1, 121–135. This alleged conspiracy between the sellers of the various vitamins listed above is referred to as the all-vitamins conspiracy. The issue before the Court is the viability of Plaintiffs' alleged all-vitamins conspiracy.

As mentioned above, the procedural history in this case is quite extensive, and a brief review of the pertinent parties and pleadings affecting this motion is warranted. On or shortly before August 6, 2002, various Defendants filed forty-nine (49) motions with the court, while various Plaintiffs filed two dispositive motions. Of the forty-nine dispositive defense motions, twenty-two related to "scope of the conspiracy" defenses. Of those twenty-two motions, sixteen of them specifically addressed Plaintiffs' alleged all-vitamins conspiracy.

On November 21, 2002, the Court heard oral argument on the all-vitamins conspiracy motions. Since that time, many individual cases have been resolved. The all-vitamins conspiracy motions that remain pending are # 11, # 13, # 16, and # 17 (as numbered in the chart submitted by Dickstein, Shapiro, Morin & Oshinsky, LLP under cover of its August 14, 2002 letter to the Court). These motions were filed by the following Defendants, respectively: Bioproducts, DuCoa and DCV, Chinook, and UCB.

Two separate moving papers have been filed on behalf of each Defendant: first, Defendants collectively filed Certain Defendants' Joint Memorandum of Law in Support of Summary Judgment on Plaintiffs' All–Vitamins Conspiracy Claim ("Defs.' Mem."); second, each Defendant filed an individual motion and reply brief on their own behalf.[5] Plaintiffs submitted

4, 2003); 1999 USDOJ Antitrust Div. Ann. Rep. at 7.

4. 1999 USDOJ Antitrust Div. Ann. Rep. at 6.

5. As indicated in the Plaintiffs' spreadsheet, enclosed under August 14, 2002 Letter from Richard Leveridge to the Court Re: In Re Vitamins Antitrust Litigation, the following are the individual dispositive motions filed by

two primary documents in opposition to Defendants' motions for summary judgment: first, Certain Plaintiffs' Joint Opposition to Certain Defendants' Joint Memorandum of Law in Support of Summary Judgment on Plaintiffs' All–Vitamins Conspiracy Claims (the "PJO"); second, Plaintiffs' Joint Counterstatement of Facts in Opposition to Defendants' Motions for Summary Judgment Regarding the Fact and Scope of the Conspiracy, Fraudulent Concealment, and Subsidiary Liability (the "PJC"). Plaintiffs also filed individual opposition papers against specific Defendants.[6]

Two groups of cases remain. Some cases against Defendants will be remanded to their original jurisdictions, while others will remain in this Court for trial.[7] The following is a breakdown of the remaining cases pending against each Defendant:

Bioproducts: (1) Class action plaintiffs'[8] cases to tried in Minnesota[9]
(2) Direct action plaintiffs'[10] cases to be remanded

DuCoa: (1) Direct action plaintiffs' cases to be remanded

Chinook: (1) Class action plaintiffs' cases to be tried in Minnesota
(2) Direct action plaintiffs' cases to be remanded

UCB: (1) Hill's Pet Nutrition cases to be remanded

All parties agree that the instant motion is to be decided before these cases are remanded to their original filing jurisdictions.

### 1. The Defendants

#### a. UCB

There are three UCB defendants: UCB, S.A.; UCB, Inc.; and UCB Chemicals Corporation. UCB, S.A. is a Belgium-based company that produces and sells prescription pharmaceuticals, high performance film and packaging materials, and specialty chemical products. The Chemical Sector of UCB, S.A., which is involved in the production and sale of specialty chemical products, manufactures and sells choline chloride. UCB, Inc. is a subsidiary of UCB, S.A. located in the United

---

the choline Defendants: # 11 Bioproducts Incorporated's Motion For Summary Judgment on Plaintiffs' "All–Vitamins" Conspiracy Claim; # 13 DuCoa, L.P.'s and DCV, Inc.'s Motion for Summary Judgment on "All–Vitamins" Conspiracy Claim; # 16 Chinook Group Limited and Chinook Group, Inc.'s Motion for Summary Judgment on Plaintiffs' All–Vitamins Conspiracy Claim; # 17 Defendants UCB S.A., UCB, Inc. and UCB Chemicals Corporation's Motion for Summary Judgment on Plaintiffs' All Vitamins Conspiracy Claim.

6. Those opposition papers are as follows: # 11 Plaintiffs' Joint Counter–Statement of Facts in Opposition to Defendants Bioproducts, Inc.'s and Thomas Sigler's Motions for Summary Judgment on Plaintiffs' All–Vitamins Conspiracy Claim; # 13 Opposition to Defendants Ducoa, L.P. and DCV Inc.'s Motion for Summary Judgment on Plaintiffs' All–Vitamins Conspiracy Claim; # 16 Plaintiffs'

Memorandum of Law in Opposition to Defendants Chinook Group Ltd. and Chinook Group, Inc. Motion for Summary Judgment on Plaintiffs' All–Vitamins Conspiracy Claim.

7. See, Proposed Agenda for February 18, 2004 Status Conference.

8. Co-lead counsel for the class plaintiffs is Boies, Schiller and Flexner, LLP; Cohen, Milstein, Hausfeld and Toll, PLLC; and Susman Godfrey, LLP.

9. A settlement in principle has been reached in this matter. See, Proposed Agenda for February 18, 2004 Status Conference, Ex. C.

10. Dickstein, Shapiro, Morin & Oshinksy represents the "direct action Tysons, et al. plaintiffs" (hereinafter referred to as the "DSMO plaintiffs"). DSMO has also acted as plaintiffs' liaison counsel for the purposes of the motions presented.

States, and UCB, Inc. is a holding company that offers support services to its subsidiaries. UCB, Inc. never manufactured or sold choline chloride. UCB Chemicals Corporation is a subsidiary of UCB, Inc. and is also located in the United States. UCB Chemicals Corporation manufactures and markets specialty chemicals. UCB Chemicals Corporation did not manufacture choline chloride during any of the conspiracy periods but did sell choline from 1999–2001. UCB Mem. in Support Mot. Summ. J. ("UCB Mem.") at 3–5.

UCB asserts that it did not manufacture or sell any vitamins other than choline chloride during the alleged conspiracy period, and did not participate in the markets for any of the non-choline vitamins during the conspiracy period. Id.

### b. DuCoa/DCV

There are two DuCoa defendants: DuCoa, L.P. and DCV, Inc. In December 1986, E.I. DuPont De Nemours and Company ("DuPont") [11] and ConAgra formed DuCon, a general partnership joint venture, in order to manufacture choline chloride. DuPont Statement of Undisputed Material Facts In Supp. Mot. For Partial Summ. J. On All–Vitamins Conspiracy ¶ 4. DuCon changed its name to DuCoa on October 1, 1991. Id. at ¶ 5. On December 31, 1992, DuCoa was converted to a limited partnership with DuPont and ConAgra as limited partners and DCV, Inc., a newly formed Delaware corporation, as the general partner. Id. Among the fourteen different partnerships organized under the umbrella of DCV, Inc., only DuCoa was involved in the manufacture and sale of choline chloride. Plaintiffs contest the accuracy of DuCoa's formation in that an insufficient record was provided by DuCoa in support thereof. Pls.' Opp'n. to Defs.' Statement of Facts Which Precludes Entry of Summ. J. on DuCoa, L.P. and DCV Inc.'s Mot. Summ. J. at 7.

DuCoa (originally as DuCon) began manufacturing choline chloride in approximately December 1987. DuCoa manufactured choline chloride from December 1987 through June 1, 2001. DuPont Statement of Undisputed Material Facts in Supp. Mot. Partial Summ. J. at ¶ 5–6. On June 1, 2001, DuCoa's choline business was sold as part of a package of businesses to Balchem. Id. In 1995, DuCoa began buying and reselling various "Vitamins" [12] and blending and selling premix. Id. at ¶ 6.

### c. Bioproducts

There is one Bioproducts Defendant: Bioproducts, Inc. Bioproducts is a wholly-owned subsidiary of Mitsui [13] located in

---

11. E.I. DuPont De Nemours and Company is a world-wide "science company" that "deliver[s] science-based solutions in markets such as food and nutrition, health care, apparel, home and construction, electronics and transportation." DuPont Statement of Undisputed Material Facts In Supp. Mot. For Partial Summ. J. On All–Vitamins Conspiracy ¶ 2. DuPont is headquartered in Wilmington, Delaware. Id.

12. Defendants have used the term "Vitamins" to describe all the vitamins in which they have been alleged to have conspired, minus Vitamin B4 (choline chloride). See, e.g., UCB's Mem. Supp. Mot. Summ. J. at 2. where UCB states:

Plaintiffs in the above-captioned actions continue to allege that [UCB] participated in a single, all-vitamins conspiracy to fix the prices of and/or allocate the markets for Vitamins A, B1 (Thiamine), B2 (Riboflavin), B3 (Niacin), B5 (CalPan), B6 (Pyridoxine), B9 (Folic Acid), B12, C, D, E, H (Biotin), Beta Carotene, Astaxanthin, Canthaxonthin, Apocarotenal, and premix (collectively "Vitamins"), as well as choline chloride ...

13. Mitsui & Co. USA, Inc. of New York and Mitsui & Co., Ltd. of Japan, one of the largest trading conglomerates of commodities in the world, are the parent corporations of Bioproducts. PJC at ¶ 37.

Fairlawn, Ohio. Bioproducts manufactured choline and vitamin premixes. Pls.' Joint Counterstatement of Facts in Opp'n to Defs.' Mots. Summ. J. ("PJC") ¶ 38. Bioproducts manufactured and sold feed-grade choline chloride during the conspiracy periods alleged by Plaintiffs. Bioproducts' Mem. Supp. Mot. Summ. J. at 2. Bioproducts maintains that it did not manufacture or sell any vitamins other than choline chloride during the conspiracy periods alleged by Plaintiffs. *Id.*

### d. Chinook

There are two Chinook defendants: Chinook Group Limited and Chinook Group, Inc. Chinook Group Limited is a corporation organized under the laws of Ontario, Canada, with its principal place of business in Sombra, Ontario. Chinook Mot. Summ. J. Ex. A (Aff. of Dean Lacy). Chinook Group, Inc. is a Minnesota corporation that is wholly-owned by its Canadian parent, Chinook Group Limited. Chinook Mot. Summ. J. on All–Vitamins Conspiracy at 2.

Chinook Group Limited manufactures and sells choline chloride which is produced at its plants in Canada. Chinook Group, Inc. provided a "toll" manufacturing service to Chinook Group Limited (formerly known as Chinook Group) from 1988 through 1998, converting aqueous choline chloride into dry choline chloride. *Id.*

Neither Chinook Group Limited nor Chinook Group, Inc. manufactured or sold any vitamin product, nor any products that could be used as ingredients in any vitamin product, other than choline chloride. *Id.*

### 2. The Product

Defendants are all manufacturers of choline chloride, also known as Vitamin B4, more commonly known as "choline." Choline is a nutritional supplement used primarily in animal feed. Choline is synthesized from three chemical products: trimethylamines, ethylene oxide, and hydrochloric acid. During the relevant time period, all of the choline chloride manufacturers made at least one of the raw materials needed to manufacture choline. Pls.' Mem. Opp'n. UCB's Mot. Summ. J. at 5.

Defendants differentiate choline from other vitamins because choline (1) is produced through a process using largely different raw materials than other vitamins, and (2) there are no substitutes for choline (and, conversely, choline is not a substitute for any other vitamin). Defendants have even defined the term "Vitamins" so as not to include choline chloride. *See, e.g.,* UCB's Mem. Supp. Mot. Summ. J. at 2. Plaintiffs argue that this "arbitrary" definition has been devised solely "to support [Defendants'] motions to sever choline from the rest of the conspiracy." Pls.' Mem. Opp'n. UCB's Mot. Summ. J. at 5.

### 3. The Alleged "Ringleaders"

### a. BASF

BASF Atkiengesellschaft, or BASF AG ("BASF"), is a corporation organized and existing under the laws of Germany. BASF's principal place of business is in Ludwigshafen, Germany. BASF Agreed Statement of Facts (Fed.Ct.Canada) (Sept. 17, 1999). Among other things, BASF is involved in the production and/or sale of oil and gas, bulk chemicals, plastics, high performance chemical products, plant protection products, and pharmaceuticals. BASF AG's Fine Chemicals Division produces and sells vitamins. At one time, BASF was the second largest supplier of bulk vitamins and carotenoids in the world. PJC at ¶ 7. From at least 1992 through 1995, BASF was one of the principal European manufacturers and marketers of choline chloride. BASF Agreed Statement of Facts (Fed.Ct.Canada) (Sept. 17, 1999).

BASF is no longer a defendant in any active litigation as BASF has settled all claims with Plaintiffs.

### b. F. Hoffman–LaRoche Ltd

F. Hoffman–LaRoche Ltd ("Roche"), headquartered in Basel, Switzerland, is one of the largest pharmaceutical and health groups in the world. PJC at ¶ 1. At the time of the European Commission decision against Roche (Nov. 21, 2001), Roche was the largest vitamin producer in the world, controlling approximately 50% of the overall market. ECF ¶ 77. Roche's vitamin operations account for approximately 8% of the corporation's overall gross income. PJC ¶ 4.

### c. Coordination of Activities

Although BASF and Roche are no longer parties to the instant motion, both are critical to Plaintiffs' case. Plaintiffs theorize that both BASF and Roche controlled the choline conspiracy. See, e.g., Pls.' Slide Ex. at 19 ("Roche and BASF were joint leaders and instigators of the collusive arrangements affecting the common range of vitamin products they produced . . . ." (quoting ECF ¶ 712)).

BASF acknowledged to both Canadian and European authorities its "pre-eminent role" in the global agreements. PJC at ¶ 344; BASF Agreed Statement of Facts (Fed. Ct. Canada (Sept. 17, 1999)). BASF provided several documents to the EC indicating its intent to fix prices and allocate market shares in the choline chloride market. See, e.g., BASF AG 0033336–55; BASF AG 003361–62; BASF AG 0033449–75; BASF AG 0033477–79; BASF AG 0033480–33564; BASF AG 0033580–613. The documents also indicate BASF's coordination of conspiracy activities with Defendants. Id.

The only direct link that Plaintiffs provide establishing Roche's connection to the conspiracy is a document produced by BASF.[14] BASF AG 0025648–49.[15] The European Commission found that Roche was the "prime mover and main beneficiary of the complex of collusive arrangements." ECF ¶ 568. The Commissions' findings, however, do not specifically address choline.[16]

A secondary argument setting forth Roche's involvement in the choline conspiracy is Roche's economic incentives. In addition to manufacturing and selling many vitamin products, Roche is also a buyer and reseller of choline chloride, primarily in the form of premix. Premix is a blend of vitamins sold as a separate product. Most animal feed is purchased in the form of premix. Choline is a component in 25% of Roche animal feed premix and therefore affects the level at which Roche sets its premix prices. PJC ¶ 63.

Plaintiffs' theorizes that Roche helped coordinate the effort to raise choline prices because higher choline prices helped Roche justify higher premix prices to their customers. Additionally, Plaintiffs assert

---

14. Other evidence is cited for the proposition that "BASF served as Roche's proxy for choline chloride." Pls.' Slide Ex. at 31, 53, 54.

15. This document is a BASF memorandum memorializing an August 12, 1993 meeting between BASF and Roche. The purpose of the meeting was to "find out whether there [was] a possibility of . . . cooperation [between BASF and Roche] with [choline chloride]."

16. The Commission found certain companies, including BASF and Roche, to have illegally fixed prices and allocated shares in the markets for vitamins A, E, B1, B2, B5, B6, C; D3, H, Folic Acid, beta carotene and carotinoids. See, e.g., ECF at 10 (chart showing "infringers" and their participation in illegal schemes in relevant vitamin markets).

that Roche was able to "marginalize" other premix competitors by "charging higher prices and limiting access to key vitamins." Pls.' Slide Ex. at 34. Plaintiffs attempt to establish, at times without direct evidence of meetings between these two co-conspirators and Defendants, that the "dominant positions" of BASF and Roche gave each the incentive to control several markets. This theory holds that the higher the price of choline, the more "reasonable" the prices of other vitamins look to BASF and Roche's customers. *See, e.g.*, Pls.' Slide Ex. at 19.

### 4. The Choline Conspiracy

For purposes of the instant motion, Defendants do not contest liability with respect to a choline chloride conspiracy. Each Defendants' formal acceptance of responsibility for the choline conspiracy varies as follows:

*UCB:* UCB has *not* pleaded guilty.

*DuCoa:* DuCoa has pleaded guilty to price fixing and customer and market allocation in the choline industry.[17]

Employees Lindell Hilling, John "Pete" Fischer and Antonio Felix have pleaded guilty to price fixing and customer and market allocation in the choline industry.[18]

*Bioproducts:* Bioproducts has *not* pleaded guilty.[19]

Employee John Kennedy pleaded guilty to engaging in price-fixing while employed at Bioproducts/Nutrius.[20]

---

17. Plea Agreement of DuCoa, L.P. (September 30, 2002) *available at http://www.usdoc.gov/atr/cases/f200300/200380.htm.* In the Plea Agreement, DuCoa agreed to the following statement:

...The information will charge the defendant with participating in a conspiracy to suppress and eliminate competition by fixing the price of, allocating customers for, and allocating the volume of the choline chloride manufactured by the defendant and its co-conspirators and sold by them in the United States and elsewhere, beginning at least as early as January 1988 and continuing until at least September 29, 1998, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

DuCoa also provided information to the European Commission regarding its role in the following agreements:

— the worldwide market for choline chloride was to be shared among the participants
— the North American producers were to withdraw from Europe and vice versa; sales volumes and market shares were to be stabilized;
— the activities of converters and distributors were to be controlled by cutting their supplies and/or forcing them out of business;
— prices for each grade or form of the product were to be increased worldwide according to an agreed schedule;
— regular meetings were to be held and commercial information was to be exchanged in order to monitor the implementation of the above agreement.
DUCOA SUPP 000869.

18. PJC ¶ 40; Plea Agreements of Lindell Hilling (Mar. 2, 1999), John L. "Pete" Fischer (Mar. 2, 1999), Antonio Felix (Mar. 2, 1999). In their Plea Agreements, Hilling, Fischer, and Felix all agree to the following statement:

...The information will charge the defendant with participating in a conspiracy to suppress and eliminate competition by fixing the price and allocating customers for, and the volume of the choline chloride sold in the United States and elsewhere, beginning at least as early as January 1988 and continuing until at least September 29, 1998, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

Hilling Plea at 2; Fischer Plea at 2; Felix Plea at 2.

19. Although it has not pleaded guilty in any forum, Bioproducts obtained immunity from prosecution in the United States for its role in the vitamins conspiracy by cooperating with the United States Department of Justice investigation into the industry. PJC ¶ 38.

20. PJC ¶ 38. Mr. Kennedy was the former choline business manager at Bioproducts. *Id.* Mr. Kennedy also worked at Chinook as vice-president for marketing sales. In his plea agreement, Mr. Kennedy admits that during

*Chinook:* Chinook has pleaded guilty to engaging in price-fixing and market allocation of the North American market for choline chloride.[21]

Employees Russell Cosburn, John Kennedy, and Robert Samuelson have also pleaded guilty to engaging in illegal price fixing while employed by Chinook.[22]

Additionally, there is evidence in the record of UCB's participation in the choline conspiracy. For example, in BASF's Agreed Statement of Facts to the Department of Justice in Canada, BASF states that it met in 1992 with senior representatives from Akzo Nobel, UCB, Bioproducts, Chinook, and DuCoa in Mexico City. In that meeting, the parties "discussed, but did not agree on, a market allocation arrangement and the desirability of a price increase for choline chloride." BASF Agreed Statement of Facts (Fed.Ct.Canada) (Sept. 17, 1999).

the time period from January 1988 through at least September 29, 1998, during which time Kennedy worked at Bioproducts and subsequently at Chinook, he "participated in a conspiracy with representatives from other vitamin manufacturers, the primary purpose of which was to fix the price, allocate customers, and allocate the volume of choline chloride sold in the United States and elsewhere." Tr. of Guilty Plea of John Kennedy before N.D. Tex. (Aug. 16, 1999).

21. PJC at ¶ 36; Chinook Plea Agreement (Sept. 29, 1999).

22. PJC at ¶ 36; Cosburn Agreed Statement of Facts (Fed.Ct.Canada) (Sept. 21, 1999); Kennedy Plea Agreement (Mar. 2, 1999); Samuelson Plea Agreement (Mar. 2, 1999).

23. The parties attempted in their briefs to diverge from the central *Celotex/Matsushita* line, which is the primary analysis here. The Court has considered these arguments and finds them unpersuasive.

Plaintiffs cite to criminal cases (*United States v. Tarantino,* 846 F.2d 1384 (D.C.Cir.

The above facts indicating the Defendants' positions with respect to admissions on a choline conspiracy are recited merely for foundational purposes. The instant motion focuses solely on whether an all-vitamins conspiracy existed from the viewpoint of each Defendant.

## II. DISCUSSION

### The Summary Judgment Standard [23]

*1. Matsushita and the Antitrust Standard*

Summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact ...." Fed.R.Civ.P. 56(c). When analyzing this evidence, the Court must view the underlying facts in the light most favorable to the party opposing the motion for summary judgment. *See e.g. Atlantic Richfield Co. v. USA Petroleum Co.,* 495

1988); *United States v. Poindexter,* 725 F.Supp. 13 (D.D.C.1989); *United States v. Kanchanalak,* 37 F.Supp.2d 1 (D.D.C.1999)); criminal antitrust cases (*United States v. Yonkers Contracting Co.,* 706 F.Supp. 296 (S.D.N.Y.1989); *United States v. American Honda Motor Co.,* 273 F.Supp. 810 (N.D.Ill.)); and a civil antitrust case (*In re Copper Antitrust Litig.,* 98 F.Supp.2d 1039 (W.D.Wis. 2000)) to support their contention that a single or multiple conspiracy issue is always a question of fact for the jury.

The single civil case that Plaintiffs point to for support, *In re Copper Antitrust Litig.,* is distinguishable in that the court was considering a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6). *Id.* at 1042. The standard of review under a Rule 12(b)(6) motion, that the plaintiff must provide only "a short and plain statement of the claim showing that the pleader is entitled to relief," is substantially different from the standard of review for summary judgment. *Id.* at 1047.

U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990), *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). At issue in this case is whether Plaintiffs' claim that Defendants participated in an all-vitamins antitrust conspiracy can survive summary judgment. The *Matsushita* line of cases addresses the summary judgment standard relating to conspiracy allegations in the civil antitrust context, and controls in the instant case. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).[24]

■ Based on an analysis of Fed. R.Civ.P. 56(c) and 56(e), the Court held in *Matsushita* that in order to survive summary judgment, litigants "must establish that there is a genuine issue of material fact as to whether [Defendants] entered into an illegal conspiracy that caused [Plaintiffs] to suffer a cognizable injury." *Matsushita*, 475 U.S. at 585–86, 106 S.Ct. 1348. The Court further explained this analysis stating:

> This showing has two components. First, respondents must show more than a conspiracy in violation of the antitrust laws; they must show an injury to them resulting from the illegal conduct.

> . . . . .

> Second, the issue of fact must be "genuine" .... In the language of [Fed. R. Civ. Pro. 56(e) ], the nonmoving party must come forward with "specific facts

showing there is a *'genuine issue for trial.'"*

. . . . .

It follows then from these settled principles that if the factual context renders respondents' claim implausible—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary.

*Matsushita*, 475 U.S. at 585–87, 106 S.Ct. 1348 (citations omitted) (emphasis in original).

■ The Court in Matsushita clarified that in the face of economic factors dictating that the nonmoving party's theory is irrational, that party must submit evidence to establish that the theory remains practical and genuine despite economic evidence to the contrary. Citing *Monsanto Co. v. Spray–Rite Serv. Corp.*, the *Matsushita* Court reiterated that the limits antitrust law places on the range of permissible inferences from ambiguous evidence dictate that "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* at 588, 106 S.Ct. 1348 (citing 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)). The importance of the nonmovant asserting a theory that makes "economic sense" is further explained by the Court:

> The absence of any plausible motive to engage in the conduct charged is highly relevant to whether a "genuine issue for trial" exists within the meaning of Rule

24. In *Matsushita,* respondents Zenith Corporation and National Union Electric Corporation sued Matsushita and 20 other Japanese manufacturers and distributors of consumer electronic parts for antitrust violations under §§ 1 and 2 of the Sherman Act, as well as other antitrust provisions. Respondents alleged that the Japanese manufacturers conspired to fix and maintain high prices for television sets sold in Japan while simultaneously conspiring to fix and maintain low prices for television sets exported to the United States. The sets exported were allegedly sold at substantial losses for the defendants. *Matsushita, 475 U.S. at 577–78, 106 S.Ct.* 1348.

56(e). Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy.

*Id.* at 596–97, 106 S.Ct. 1348.

### 2. Economic Plausibility

■ The defense argues that Plaintiffs' economic theory is implausible, and the evidence presented indicates procompetitive, rather than anticompetitive, conduct. Defendants further submit that the *Monsanto* case bars Plaintiffs from an inference of antitrust behavior because there are two reasonable interpretations of the evidence, and Plaintiffs interpretation of the evidence is supported by an economic theory that is irrational like the theory presented in *Matsushita*. *See, e.g.,* Hr'g Tr. at 121–23; *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 768, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). The reason that there are competing inferences, Defendants argue, is that the so-called "co-conspirators" had legitimate business relationships with the choline Defendants as either buyers or sellers of certain products. Hr'g Tr. at 121–23. Defendants contend that all of the evidence proffered by Plaintiffs in response to their motions is consistent with procompetitive conduct. For example, Defendants argue that Roche's position as a buyer of choline

renders every communication with the choline Defendants legitimate.

In response to Defendants references to the implausible economic theory rejected by the *Matsushita* Court, Plaintiffs argue their all-vitamins conspiracy theory stands on solid ground:

> Many vitamin purchasers—and plaintiffs in this litigation—bought a broad range of different vitamins. Because many customers purchased a panoply of vitamins, defendants needed to avoid the appearance of vigorous price competition on one vitamin vis-a-vis any other vitamin. As defendants frequently recognized, price trends on one vitamin product could affect prices for other vitamin products and especially that deterioration of pricing on one vitamin could spread to other vitamins. Thus, the success of the overall vitamins conspiracy depended on the participation by each member of the conspiracy, including those who sold only a single vitamin.

PJO at 37.

The question is whether communications among Defendants regarding the vitamin markets are justified as procompetitive behavior or are consistent with collusive activity. Judge Posner, writing for the three judge panel in *In re High Fructose Corn Syrup,* suggested that *Matsushita* permitted a sliding scale approach in antitrust cases, stating: "[m]ore evidence is required the less plausible the charge of collusive conduct." *In re High Fructose Corn Syrup Antitrust Litig.* 295 F.3d 651, 661 (7th Cir.2002).[25] Judge Posner

---

25. In the *High Fructose Corn Syrup* case, the plaintiff class of direct purchasers brought suit against the principal manufacturers of high fructose corn syrup ("HFCS"). *In re High Fructose Corn Syrup Antitrust Litig.,* 295 F.3d 651 (7th Cir.2002). The plaintiffs claimed that in 1988, the defendants secretly agreed to raise prices of differently graded HFCS products. These artificial price in-

creases allegedly continued until approximately mid–1995. *Id.* at 653–54. Judge Posner, writing for the three judge panel, held that although there was no proof of defendant admissions as to a price fixing conspiracy, evidence "from which the existence of such an agreement can be inferred" could be presented to defeat summary judgment. *Id.* at 654. Judge Posner suggested that *Matsushita*

**14**

further explained in cases where there is no proof of defendant admissions as to a price fixing conspiracy, evidence "from which the existence of such an agreement can be inferred" may be presented to defeat summary judgment. *Id.* at 654. This point was further explained when Judge Posner warned of certain "traps" courts should avoid when ruling on motions for summary judgment. He explains that a court should not fall into the trap of assuming that:

> if no single item of evidence presented by the plaintiff points unequivocally to conspiracy, the evidence as a whole cannot defeat summary judgment. It is true that zero plus zero equals zero. But evidence can be susceptible of different interpretations, only one of which supports the party sponsoring it, without being wholly devoid of probative value for that party.[26]

*Id.* at 656.

One certainty that can be drawn in this case is that various Defendants' alleged conduct is without question dissimilar to the conduct at issue in *Matsushita*. In *Matsushita*, the defendants' conduct had tangible, procompetitive effects: each defendant was lowering the price of their product in the U.S. market. *Matsushita*, 475 U.S. at 577, 106 S.Ct. 1348. When prices are lowered, other competitors are forced to compete and consumers win. The rationale behind the Supreme Court's decision in *Matsushita* is to protect market players who exhibit this type of unquestionably postoperative behavior that

leads to consumer-friendly results in the overall marketplace.

If Roche discusses choline production with a choline producer, that discussion is one of many routine business transactions that occurs world-wide in virtually every market on a daily basis. Although the inference of collusion may be unclear, as Defendants suggest, it is just as unclear that any *procompetitive* effects result from such behavior. Furthermore, the inference against procompetitive effects in these situations is significantly stronger in light of the concession made by some defendants that a choline chloride conspiracy took place. The Court recognizes that Roche is also a legitimate purchaser of choline chloride and has the right to talk to its sellers as a legitimate purchaser. As explained in *High Fructose*, however, the evidence as a whole—i.e., the backdrop of widespread, admitted, illegitimate behavior—cannot be ignored. Defendants position that discussions between admitted conspirators *must* be evidence of procompetitive behavior simply is not convincing.

In looking at the entire factual context to determine whether the reasonable inferences that Plaintiffs seek could have a competing inference of independent action, as is required by *Matsushita*, 475 U.S. at 587–88, 106 S.Ct. 1348, the Court finds that the Plaintiffs' inference of conspiracy is, in general, entirely plausible. Furthermore, as the Supreme Court explained in *Eastman Kodak Co. v. Image Technical Serv., Inc.*, "The Court's requirement in *Matsushita* that the plaintiffs' claims make economic sense did not introduce a special

permitted a sliding scale approach: "[m]ore evidence is required the less plausible the charge of collusive conduct." *Id.* at 661.

**26.** The other two traps Judge Posner warned against include "weighing conflicting evidence (the job of the jury)" and "failing to distinguish between the existence of a con-

spiracy and its efficacy ..." An agreement to fix list prices [even where actual sales were made below those list prices] is ... a per se violation of the Sherman Act even if most or for that matter all transactions occur at lower prices. *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir.2002).

burden on plaintiffs facing summary judgment in antitrust cases ... *Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated in that decision." 504 U.S. 451, 468, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

## The Alleged "All–Vitamins" Conspiracy

Both Plaintiffs and Defendants use essentially the same elements to define what constitutes a conspiracy:[27] (1) Defendants must have had knowledge of an "all-vitamins" conspiracy, (2) Defendants must have intended to join the "all-vitamins" conspiracy, and (3) by joining the "all-vitamins" conspiracy, Defendants were interdependent upon one another in that their respective benefit depended on the success of the "all-vitamins" venture. *E.g. United States v. Tarantino*, 846 F.2d 1384, 1392 (D.C.Cir.1988).

27. *Compare* the headings in the Plaintiffs' brief:
A. A Defendant Joined the General Vitamins Conspiracy if [1] It Knew That Vitamins Other Than Those It Sold Were Involved, and [2] That Its Own Benefits Depended on the Success of the Larger Venture.
F. Defendants' Intent to Join the Common Goal Can Be Inferred from the Evidence of Knowledge and Interdependence
PJO at 26, 47.
*with* the elements proscribed in the Defendants' brief:
To meet their burden of showing the Moving Defendants participated in an all-vitamins conspiracy, plaintiffs must demonstrate, defendant by defendant, that: (i) each Moving Defendant had knowledge of such a purported all-vitamins conspiracy; (ii) each Moving Defendant intended to join the purported all-vitamins conspiracy; and (iii) there was interdependence among the defendants alleged to have participated in the purported conspiracy.
Defs.' Mem. at 9.

28. The Court agrees with Defendant's statement, "The substantive legal standards for

### 1. Knowledge

■ In order to establish the requisite knowledge of the conspiracy, Plaintiffs must prove that each Defendant was united in a common unlawful goal or purpose, or knew of the conspiracy's general scope and purpose. *Tarantino*, 846 F.2d at 1392 ("A single conspiracy may be established when each conspirator knows of the existence of the larger conspiracy and the necessity for other participants, even if he is ignorant of their precise identities.").[28] The parties are in agreement on this issue.[29]

■ Although Plaintiffs must show that each Defendant had knowledge of an agreement as to the overall conspiracy, they need not show (1) evidence of a formal agreement, or (2) knowledge, on behalf of the Defendant, of every detail of the alleged conspiracy. *United States v. Nusraty*, 867 F.2d 759, 763 (2d Cir.1989)

determining the existence and scope of a conspiracy are the same in the civil and criminal contexts." Defs.' Mem. at 10, n. 6. Judge Posner, writing for the court in *Jones v. City of Chicago*, held in a section 1983 tort claim that "[t]he requirements for establishing participation in a conspiracy are the same ... as in a case (criminal or civil) in which conspiracy is a substantive wrong." 856 F.2d 985, 992 (7th Cir.1988) (citing *Hartford Accident & Indemn. Co. v. Sullivan*, 846 F.2d 377, 383 (7th Cir.1988)).

29. *Compare* PJO at 27 ("If plaintiff can show a single plan, goal or purpose on the part of defendants, it can establish a single conspiracy." (citing *In re Copper Antitrust Litigation*, 98 F.Supp.2d 1039, 1054; *United States v. Daily*, 921 F.2d 994, 1007 (10th Cir.1990))); *with* Defs.' Mem. at 11–12 ("A defendant need not be aware of every detail of the alleged conspiracy to be found liable, but it must at least know the object and general scope of the conspiracy." (citing *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F.Supp. 1053, 1066–67 (D.Md. 1991))).

("the 'government's proof of an agreement' does not require evidence of a formal or express agreement; it is enough that the parties have a tacit understanding to carry out the prohibited conduct.") (citations omitted); *Mylan Labs., Inc. v. Akzo, N.V.,* 770 F.Supp. 1053, 1066 (D.Md.1991) ("[plaintiff] need not show that each alleged conspirator had knowledge of all of the details of the conspiracy" (citations omitted)).

 Additionally, although Plaintiffs must establish a common goal, it is not necessary to provide direct evidence of the conspiracy. *See United States v. Consol. Packaging Corp.,* 575 F.2d 117, 126 (7th Cir.1978) (holding that direct evidence is not needed to prove a conspiracy, rather "a common purpose and plan may be inferred from a 'development and a collocation of circumstances' ") (citing *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942)). *Cf. Continental Ore Co. v. Union Carbide and Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) (noting that parties should be given the full benefit of their evidence without the Court "compartmentalizing the various factual components and wiping the slate clean after scrutiny of each").

### 2. Intent to Join

 Knowledge alone is not sufficient to prove that any particular Defendant intended to join the all-vitamins conspiracy. *United States v. Townsend,* 924 F.2d 1385, 1391 (7th Cir.1991) (mere knowledge not enough to "tie the conspiracy together"); *United States v. Simms,* 508 F.Supp. 1188, 1198 (W.D.La.1980) (mere knowledge of object or purpose, "without the intention and agreement to cooperate" not sufficient). *Cf. United States v. Saro,* 24 F.3d 283, 288 (D.C.Cir.1994) (defendant "not ac-

countable" where co-conspirators actions are merely foreseeable).

 Although "mere knowledge of another similarly motivated conspiracy or an overlap in personnel do not prove one overall agreement," there may be an intent to join an overall, conspiracy if the "common purpose of a single enterprise .... motivate[s] each participant and each act." *United States v. Snider,* 720 F.2d 985, 988 (8th Cir.1983). The Supreme Court has explained that a party progresses from mere knowledge of an endeavor to intent to join it when there is "informed and interested cooperation, stimulation, instigation. And there is also a 'stake in the venture' which, even if it may not be essential, is not irrelevant to the question of conspiracy." *Direct Sales Co. v. United States,* 319 U.S. 703, 713, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943). The intent that must be shown in a conspiracy case is the intent to advance the unlawful purpose of the conspiracy. *United States v. Haldeman,* 559 F.2d 31, 112 (D.C.Cir.1976).

### 3. Interdependence

 In this case, Defendants argue that "[Plaintiffs must show that] each individual vitamin producer needed to have the prices of many vitamins fixed to benefit from anticompetitive conduct in its vitamin market" and if there is no such showing, "a fact finder could not legitimately conclude that a single conspiracy existed." Defs.' Mem. at 20. "Thus, plaintiffs must show, for example, that price fixing activities in Vitamin B5 were somehow necessary for manufacturers of choline chloride to successfully raise prices." Defs.' Mem. at 21.

 This Circuit has recognized a more relaxed standard. "Fairly minimal" evidence is needed in order to establish interdependency between various branches of a common conspiracy. *United States v. Gatling,* 96 F.3d 1511, 1522 (D.C.Cir.1996)

(finding interdependence between various participants in conspiracy to commit bribery based on minimal factors such as an overlap in participation and timing); *United States v. Graham*, 83 F.3d 1466, 1471–72 (D.C.Cir.1996) (finding interdependence between members of competing ·drug cliques who assisted each other on occasion, even though the assistance was not significant to the success of each clique). *United States v. Mathis*, 216 F.3d 18, 24 (D.C.Cir.2000) ("Fairly minimal' evidence may establish interdependency").

### The All–Vitamins Conspiracy Evidence

*1. The Choline Conspiracy*

*a. The North American Market*

Chinook and other North American co-conspirators admit that they began fixing prices, allocating customers, and allocating the volume of choline chloride sold in Canada, the United States, and elsewhere around January 1988. Chinook Plea Agreement (Sept. 29, 1999); Hilling Plea Agreement (Mar. 2, 1999); Felix Plea Agreement (Mar. 2, 1999); Fischer Plea Agreement (Mar. 2, 1999). The North American choline producers' conspiracy agreement ran at least until September 1998. *Id.*

Russell Cosburn testified that around 1988 he met with representatives from companies including Bioproducts, DuCoa, and DuPont at DuPont's offices in Wilmington, Delaware. PJC ¶ 358 (citing Cosburn Dep. at 54). Cosburn stated that the meeting was called and chaired by Dr. Earnest Porta on behalf of DuPont. Porta indicated to the group that the European choline producers "knew how to market and sell products better· than the participants they had sort of industry connections amongst themselves." Cosburn Dep.

at 53–54. Porta suggested that the meeting attendees (i.e., the North American choline producers) "should start doing the same things in North America." *Id.* Porta proposed that the North American producers should "decide how [they] could keep price stability in the market" by, for example, "divid[ing] up customers, or ... stay[ing] firm on prices." *Id.* at 56.

In early 1988, DuCoa, Bioproducts and Chinook agreed to raise prices of choline. Cosburn indicated that the agreement to do so was carried out as follows:

> ... [W]e would increase the choline prices by three-quarters of a cent or a cent or whatever was decided by whose turn it was to raise prices ... so that [for example] if DuCoa announced an increase of one cent a pound on choline chloride on such and such a date, across the board ... then Chinook would come out and say, "We are going to adopt the new price list published by," et cetera, ·and then Bioproducts would do it, and ·this would go on and on.

Cosburn Dep. at 62–63. The price increases were published in trade publications such as the industry trade journal, Feedstuffs. *Id.*

*b. The European Market*

The evidence indicates that the European producers began fixing prices and allocating market shares of choline chloride as early as 1983. *See, e.g.,* UCB Answers to Interrogs. (Dec. 7, 2001). UCB submissions to the European Commission indicate meetings among the European producers to fix prices and allocate markets in Europe. *See, e.g.,* UCBSA–017937· (meeting between UCB, BASF and Akzo Nobel re: "guid[ing]' prices, supply to a certain number of clients in Germany, Belgium, France, and The Netherlands").[30]

---

30. While BASF admitted to conspiratorial activity in North America, BASF only acknowl-

Russell Cosburn testified in his deposition that by around January 1988, it was "fairly common knowledge" in the choline industry that the Europeans were engaged in cartel activity. Cosburn Dep. at 54. Specifically, the European producers "probably got together and managed the industry in one way or another." *Id.* Management of the industry included the choline chloride market. *Id.*

### c. The Europeans vs. the North Americans: Conspiracies Threatened

The North Americans and Europeans were successfully controlling their respective markets by the early 1990s. Cooperation across the two markets did not arise until players from each side entered, or threatened to enter, the other's market. Price competition from overseas would have destabilized or destroyed the separate conspiracies in each market. PJC at ¶ 355.

For example, around 1990, Chinook, the North American producer located in Canada, began to "aggressively" expand their choline sales into Europe, which "upset" the European producers. Cosburn Dep. at 98–99; Hooghe Dep. at 295. Mr. Leopold Hooghe, a UCB employee, testified that around 1990, he met with Chinook representative Russell Cosburn at a bar in the Brussels, Belgium airport. Hooghe Dep. at 299–300. Hooghe testified that:

> [Cosburn] became a bit talkative and [began] telling me that [Chinook was] to become the biggest [choline producer] all over the world ... because [Chinook] had the best quality and the best product and the lowest price ... [Cosburn said that Chinook would] just start in Belgium, but one country after another

[Chinook would] take and ... within a couple of years, there will be left only one name in choline chloride and that will be Chinook.

> ... [Cosburn] told me that [Chinook was] happy and they could always undercut [UCB]. There wouldn't be a problem even if they had to sell at very low prices.

*Id.* At that same meeting at the Brussels airport, Mr. Hooghe also became aware that American choline producers (i.e., Bioproducts and DuCoa) had "agreements" among themselves to control market prices: "So in that same informal meeting, Russ Cosburn made very clear to me that there were agreements between the American producers." *Id.*

Cosburn testified that only "a few months" after Chinook started selling in Europe, he received a phone call from Dr. Walter Kohler of BASF. Cosburn Dep. at 98. Kohler indicated "that [the European producers] had noticed Chinook had become very active in the Far East ... and the most disturbing thing to him was that [Chinook was] now putting product into Europe." *Id.* at 99. Kohler wanted to know what Chinook's objectives and intentions were in the choline markets. *Id.*

The Europeans retaliated. In 1992, a BASF subsidiary in Mexico entered into a contract to supply choline in the United States. In response, Bioproducts, Chinook and DuCoa called a meeting with BASF to "complain about [BASF"s] pricing and to suggest setting limit prices in the U.S." BASF AG 0033443.

In early 1992, Leopold Hooghe from UCB traveled to North America for separate meetings with DuCoa and Chinook.

---

edged that "sporadic efforts" were made among the three European producers of choline to "reach agreements regarding European markets and prices" but that "no effective agreement was ever reached or implemented" regarding choline chloride. BASF AG 0033446.

Hooghe Dep. at 293. Hooghe told the North American producers that UCB was interested in selling choline in the United States. The statement was a bluff, intended to force the North Americans to "reconsider the way they started behaving in selling ... in Europe one or two years before." *Id.* at 294. Hooghe told Chinook about the sham strategy, then told Bioproducts and DuCoa a day and two days later in part to confirm "there were [illegal] contacts" among those producers. *Id.* at 301–02.

### d. The North Americans and Europeans Meet

The greater choline conspiracy involving both the North Americans and Europeans began at least in 1992, at approximately the same time both sides began penetrating each other's markets. PJC ¶¶ 343–44. It is through this interaction to coordinate conspiracies that Plaintiffs allege the North American Defendants became aware of the all-vitamins conspiracy.

In a call Walter Kohler made to Russell Cosburn of Chinook, Kohler suggested that Cosburn meet with representatives from UCB and Akzo Nobel, the two other European choline producers. Cosburn Dep. at pp. 104–05. Kohler even provided names for Cosburn to contact. *Id.* Cosburn followed up with meetings with representatives from both companies. *Id.*

The first meeting between all the major parties was in Mexico around October 1992. Hooghe Dep. at pp. 290–91. There, UCB met with BASF, Akzo Nobel, Bioproducts, Chinook and DuCoa. Both sides talked about exiting the other's markets. Kennedy Dep. at 419. BASF then took the lead and proposed that the parties stop arguing about territory and settle on "world capacities for choline." *Id.* at 420. The parties agreed to meet again in Germany. *Id.* at 426.

The following month, the parties gathered at Ludwisghaven, Germany. In Ludwigshafen, an agreement was made whereby the North American suppliers would withdraw from Europe and the Europeans would withdraw from the United States. *Id.* at 447. The parties also discussed "target prices" which the parties agreed to charge customers. *Id.* at 448–450. From November 1992 through April 1994, the parties met on a number of occasions to reaffirm their agreement by exchanging data regarding market shares, sales and overall progress. PJC at ¶¶ 367–68

### 2. The All–Vitamins Conspiracy Evidence Against Each Party

The Court must view the evidence from the standpoint of each Defendant to determine liability in a conspiracy case. *United States v. United States Gypsum Co.*, 438 U.S. 422, 463, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978) ("Liability [can] only be predicated on the knowing involvement of each defendant, considered individually, in the conspiracy charged.").

### a. UCB

Although UCB contests liability for the choline conspiracy, there is evidence that UCB participated in the price fixing and allocation of the choline market. For example, the evidence indicates that UCB attended the Mexico City meeting in 1992 where senior representatives from BASF, Akzo Nobel, Bioproducts, Chinook, and DuCoa discussed choline market allocation. *See, e.g.,* BASF Agreed Statement of Facts (Fed.Ct.Canada) (Sept. 17, 1999).

The main document Plaintiffs offered to link UCB to the all-vitamins conspiracy is the internal memorandum from Christopher Tarmu to Guy Van Den Bossche, both UCB employees, detailing Tarmu's meeting with John Hobbs from Roche.

UCBSA 018056–018057. The relevant portion of the memo reads, "I learned some interesting information about competition and the price information which is given below *was taken directly off John Hobbs' computer screen* which he turned round for me to read!!" *Id.* (emphasis in original).

The document indicates that Tarmu was meeting with Hobbs, "who is Purchasing Director at Roche Products," in order to "sort out the ongoing problem about this first trial bulk delivery." *Id.* Looking at the document in its entirety, the statement quoted above has a much more innocuous meaning. In addition, there is evidence in the record that Tarmu frequently met with Hobbs in order to discuss legitimate sales. *See, e.g.,* UCBSA013971–013972. Further, Tarmu writes,

[O]ne of the problems with Roche is the transparency of their purchasing information around Europe. John Hobbs is a smart man, and he only revealed the UCB Leuna information to me after we had quite a hard negotiation in which I was attempting to justify no weakening of the current price offered of £520/ tonne.

John Hobbs has accepted this further trial order, but I quite understand his point against the background of the above information, when he says that if UCB wishes to have business every month . . . ., then there has to be further negotiation on prices.

UCBSA–018057. The Plaintiffs' theory that Roche is coordinating the price-fixing of choline through its buyer position is not supported here. Rather, it is contradicted. Roche is conducting negotiations with UCB. The implication to be drawn is that Roche is willing to deal with UCB, but only if their price can be negotiated. Plaintiffs cannot be entitled to the inference of an all-vitamins conspiracy from this document that so plainly speaks in competitive terms.

The Plaintiffs also attempt to establish UCB's liability on the all-vitamins conspiracy through its seller/buyer relationship with Roche and Rhone–Poulenc:

Like the other choline producers . . . UCB had a close relationship with non-choline producer and Vitamins Inc. ringleader Roche. In addition to these arrangements with Roche, UCB sold choline to Rhone Poulenc, another key member of Vitamins Inc. UCB also sold choline to Degussa, another member of Vitamins Inc. that did not produce choline. Through these relationships with companies involved in other aspects of the conspiracy, UCB knew the full scope and implication of Vitamins Inc. In addition, it even adopted the conspiracy's terminology calling the choline component the "club." And UCB followed the same model that was used throughout the conspiracy in setting prices and adhering to market allocation.

PJC at 177 ¶ 376. This "relationship" evidence, even viewed in the light most favorable to Plaintiffs, does not indicate even an inference of UCB's knowledge of or participation in an all-vitamins conspiracy.

The Plaintiffs have provided no evidence that can satisfy even a very low burden of establishing that UCB at least knew of and possibly participated in an all-vitamins conspiracy.

*b. DuCoa*

■ One of the most damaging documents indicating DuCoa's participation in the alleged all-vitamins conspiracy is a fax from Takeda to DuCoa regarding a February 9, 1993 meeting between the two companies. DUCOA 060806. The fax lists "Overall market review" as one of the topics on the proposed agenda. *Id.* The next line on the fax proposes that the choline

chloride market be next on the agenda, broken down between the world market and the Asia/Japan market. *Id.*

Although the term "Overall market review" is not defined, the Court can infer that this phrase relates to vitamins other than choline for two reasons. First, discussion of the Choline Chloride market is listed as a separate agenda item. Second, because Takeda neither manufactures, sells nor purchases choline chloride,[31] it is hard to believe that discussion of "Overall market review," which is to be lead by Takeda, will discuss Choline Chloride. Although there is no evidence that this meeting actually took place, that issue is immaterial to the Court's analysis. At a minimum, this document indicates that these two parties had discussions regarding vitamins other than choline.

The Court is not bound to examine this document in a vacuum. *See, e.g., Continental Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." (citations omitted)). In light of the factual background that Takeda was found to have participated illegally in five different cartels (specifically, vitamins B1, B2, B6, Folic Acid, and C);[32] and DuCoa has

pleaded guilty to price-fixing and customer and market allocation in the choline industry,[33] there is a higher probability that this document supports a finding of illegal activity on behalf of DuCoa.

A similar document sent by Rhone–Poulenc to DuCoa shows substantially the same conduct. In an April 1, 1997 fax from Rhone–Poulenc to DuCoa, Rhone–Poulenc lays out a planned agenda for meetings between the two parties on April 28, 1998 and April 29, 1998. DUCOA087581–DUCOA087583. On the top of the list of topics to be covered at the meeting states the following: "First and Foremost is this is an opportunity for open sharing of plans and directions for both companies to complement each others objectives and goals in the long term." DUCOA–087582. These are two competitors meeting about "sharing plans" and "complementing" their businesses—not the types of discussions that should take place between competitors.

Also included in the topics to be covered during the meeting were "DuCoa's plans for vitamin premixes" and "How can RPAN support [DuCoa's] efforts"; a review of DuCoa's operations, products, and services; "DuCoa's perception of how the livestock market will evolve in the next 5 years;" comments DuCoa has "regarding

**31.** There is no indication in the record that Takeda manufactured, sold or bought choline chloride. *See, e.g.*, PJC at ¶¶ 17–20.

**32.** *See, e.g.*, Mem. of Points and Authorities Supp. Takeda's Mot. Partial Summ. J. Dismissing Pls.' All–Vitamins Conspiracy Claim, Any Claim That Takeda Participated in Any Conspiracies Involving Vitamins That It Did Not Manufacture, and Any Claim That Takeda Participated in Any Conspiracies Extending Beyond 1995, at 7 (citing Comm'n of the European Communities, Comm'n Decision of November 21, 2001 relating to a proceeding pursuant to Article 81 of the EC Treaty and Article 53 of the EEA Agreement, at 10(a)).

This document is not part of the record of the instant motions, but was submitted in conjunction with all dispositive motions. It is cited here solely for use of the information conveyed.

**33.** "Three individuals employed by DuCoa have pleaded guilty to price-fixing and customer and market allocation in the choline industry: Lindell Hilling, Pete Fischer, and Antonio Felix." PJC at 19 ¶ 40 (citing Plea Agreements of Lindell Hilling (Mar. 2, 1999), John L. "Pete" Fischer (Mar. 2, 1999) and Antonio Felix (Mar. 2, 1999)).

key players in the market"; and a request for comments on DuCoa's competitors of choline, premixes and distribution, Roche, BASF, Novus, Degussa, and the National feed companies." *Id.* In exchange, the agenda called for Rhone–Poulenc to "share their perspective in several of the [same areas]." *Id.* Rhone–Poulenc was also to cover an "update on the global vitamin market (demand and pricing) with a focus on vitamin E." DUCOA–087583.

These two documents establish that there is a genuine issue of fact as to whether DuCoa had knowledge of an all-vitamins conspiracy. Additionally, this documents show there is enough evidence to create a factual issue as to whether DuCoa manifested an intent to join, and interdependence on, the all-vitamins conspiracy. Summary judgment in DuCoa's favor is therefore not justified.

### c. *Bioproducts*

Bioproducts asserts it did not manufacture or sell any vitamin other than choline and premix, or any of the raw materials used in the manufacture of other vitamins, during the conspiracy periods alleged by Plaintiffs. Bioproducts Mem. at 2. Bioproducts also points out that it has never been tried for, convicted of, or pleaded guilty to any criminal offense in the United States. *Id.* at 4. Nevertheless, John Kennedy, a former Bioproducts employee who later was employed by Chinook, pleaded guilty to charges relating to his involvement in a choline chloride conspiracy and served time in prison. *Id.* at 10.

On June 27, 1991, Kennedy, who was working for Bioproducts at the time, had a meeting with Dietz Kaminski and Peter Haag of BASF. Among the notes taken during that meeting, Kennedy drew out a rough organizational chart of the BASF Fine Chemical Division. BIO 019731. Kennedy, Kaminski and Haag discussed BASF's general sales figures and research costs. BIO 019732. Kaminski and Haag broke down for Kennedy the total market for vitamin feed among the four main world competitors: BASF, Roche, Rhone–Poulenc, and Takeda. Kaminski and Haag also gave company-specific sales volumes for vitamins A, E, B2, C, and Calpan. BIO 019733.

In his narrative notes of the same meeting, Kennedy mentioned discussions about "acceptable margins" for the "vitamin businesses." BIO 019734. Kennedy reported, "[BASF] obviously [is] trying to push vitamin and choline prices up to achieve acceptable profitability." *Id.* Kennedy thought this information was so productive that he proposed "Bioproducts should make the effort to meet with [BASF] no less than annually for both vitamin and choline world perspectives." *Id.* This document provides a clear indication that Bioproducts was aware of the vitamins conspiracies in general. Bioproducts wanted to update itself frequently on the progress of the conspiracies in each market, likely in order to track parallel progress of the conspiratorial successes or failures outside their market.

Furthermore, Kennedy had been aware of the interrelationship of the conspiratorial agreements. In the choline meeting set up in Ludwigshaven shortly after the Mexico meeting, Kennedy had commented (in the context of choline-specific agreements) that "everything was interrelated, that it didn't make sense to agree on one thing if [the producers] could not agree on the other things." Hooghe Dep. at 386.

This evidence fulfills Plaintiffs burden to demonstrate that there exists a genuine issue as to Bioproducts knowledge of the all-vitamins conspiracy. Furthermore, the evidence establishes that whether Bioproducts possessed an intent to join and interdependence on the all-vitamins conspiracy

are issues that should be presented to a jury.

### d. Chinook

Evidence connecting Chinook to the alleged all-vitamins conspiracy is seen through the deposition testimony of Chinook employee, Russell Cosburn. Cosburn testified that around January 1988, he met with representatives from companies including Bioproducts, DuCoa, and DuPont at DuPont's offices in Wilmington, Delaware. Cosburn Dep. at 52–53. At that meeting, Dr. Porta of DuPont referred to European "cartel type business" in the vitamin markets. *Id.* at 53–53. It was suggested that North American producers should adopt these cartel type business practices. *Id.* at 56. During the last couple months of 1988, a second meeting was held in which North American Choline producers, including Chinook, agreed to fix the prices of choline chloride. *Id.* at 62–63.

Cosburn also testified that during a trip to Europe that included a meeting with Dr. Walter Kohler of BASF, he learned that Europeans had a cartel related to vitamins other than choline. Cosburn Dep. at 104–106. Cosburn testified, "On more than one occasion there was [sic] vitamin cartels referred to ...." *Id.* This evidence establishes that Cosburn, acting on behalf of Chinook and with the consent of his boss Peter Copland,[34] had knowledge of a conspiracy other than the choline conspiracy.

There is evidence that Chinook, through Cosburn, actively participated in the choline price-fixing conspiracy. Furthermore, Chinook employees knew there were conspiracies involving vitamins other than choline. When the evidence supporting these two facts is woven together and viewed in the light most favorable to the plaintiffs, it establishes a genuine issue as to whether Chinook knew of, intended to join, and was interdependent on the all-vitamins conspiracy.

## III. CONCLUSION

Under the *Matsushita* analysis, the conspiratorial actions engaged in by Defendants do not indicate a reasonable presumption of procompetitive conduct. Therefore, Plaintiffs are entitled to the benefit of the jury determining inferences rather than the Court doing so at the summary judgment stage. Where the evidence is insufficient to allow a reasonable inference of participation in the alleged all-vitamins conspiracy, however, Plaintiffs' case must fail. The Court has evaluated Plaintiffs' claims from the standpoint of each individual Defendant. The elements of conspiracy doctrine are minimally satisfied by the evidence presented with respect to DuCoa, Bioproducts and Chinook.

For the reasons set forth above, Defendants DuCoa, Bioproducts and Chinook's Motions for Summary Judgment are denied; Defendant UCB's Motion for Summary Judgment is granted. An appropriate order will accompany this Memorandum Opinion.

---

34. Cosburn testified that after the first cartel meeting among North American producers, Cosburn reported back to Copland who advised him to "be cautious," but indicated to "go along with [the conspiracy agreement]." Cosburn Dep. at 58.